215 P.3d 961 (2009)
STATE of Washington, Respondent,
v.
Dennis GRAY aka Dennis Galusha, Appellant.
No. 61709-5-I.
Court of Appeals of Washington, Division 1.
July 6, 2009.
Publication Ordered August 28, 2009.
*963 James Morrissey Whisman, King County Prosecutor's Office, Seattle, WA, for Respondent.
Nancy P. Collins, Washington Appellate Project, Seattle, WA, for Appellant.
APPELWICK, J.
¶ 1 In 1991, Dennis Gray was convicted of first degree rape and attempted first degree rape. Gray appeals the trial court's denial of his 2007 request, pursuant to RCW 10.73.170, for postconviction DNA testing on the physical evidence used at trial. Gray satisfied the statute because he met the procedural requirements of the statute by demonstrating that DNA testing had advanced since the time of trial, and by demonstrating that the evidence from the DNA testing would be new, significant, and material to the identity of the perpetrator. Gray satisfied the substantive requirement of the statute by demonstrating the likelihood that the evidence would suggest innocence on a more probable than not basis. We reverse and remand.

FACTS[1]
¶ 2 Dennis Gray was convicted of first degree rape, attempted first degree rape, and unlawful imprisonment for an incident that occurred on August 7, 1991. Four teenagers, two girls and two boys, were camping near the home of one of the girls when Gray[2] approached their campsite, made some small talk, and asked if they had any marijuana. Gray left, but returned a few moments later, this time carrying a knife with a four to six inch blade. He grabbed R.J., one of the girls, and told the boys to lie down or he would kill her. The boys complied. When R.J. refused to take her clothes off, Gray held her around the throat with the knife to her neck and told C.S., the other girl, to take her clothes off. Without releasing R.J., Gray forced C.S. to perform fellatio on him. Gray pushed C.S. on her back and attempted to vaginally penetrate her. He then anally raped her. At some point during the rape, Gray's grasp loosened on R.J., and she was able to run away. Gray fled.
¶ 3 Police arrived on the scene shortly after the attack and found a truck registered to Gray near the campsite. Police set up surveillance. At about 5:00 a.m., Gray emerged from a field near R.J.'s house, and police arrested him, as he matched the teenagers' description. They described Gray as wearing a black leather biker-type jacket, jeans, and black boots. On the jacket was a distinctive lapel pin. Gray had a beard and long ponytail.
¶ 4 Police brought bloodhounds to the scene of the attack, where they were scented to Gray using clothing Gray was wearing at the time of his arrest. The dogs then located Gray's scent at the rape scene, followed it through a field, out onto the street, and to the spot where police arrested Gray and put him in the patrol car.
¶ 5 Police prepared a photo montage, where Gray's ponytail had been undone. They showed it to the four teenagers. None picked Gray. The two boys, but not the two girls, positively identified Gray in a second montage where his hair was in a ponytail.
*964 ¶ 6 Police collected rectal and vaginal swabs;[3] pubic and head combings; and the underpants, bra, shorts, and tights from C.S. The swabs and clothing were tested for semen, with negative results. No DNA (deoxyribonucleic acid) testing was done on the swabs. Police also collected samples from Gray's clothing. In addition, hairs were collected from both victims, including C.S.'s pubic and head combings, the sleeping bags on which the attacks occurred, and Gray's clothing and belongings. Hair comparison analysis presented at trial showed that two of the five hairs recovered from one sleeping bag were dissimilar to all the control hair samples. None of the forensic scientist's analysis conclusively established Gray as the assailant. DNA testing of the hair samples was not conducted.
¶ 7 Gray filed a motion for postconviction DNA testing under RCW 10.73.170 in King County Superior Court on February 13, 2008. Gray moved the court to allow DNA testing on three groups of evidence: (1) clothing worn by C.S. and R.J.; (2) hairs recovered from the scene, the victims, and Gray; and (3) rectal and vaginal swabs taken from C.S. just after she was raped.[4] The trial court denied Gray's motion, stating only that "[d]efendant's Motion is Denied for failure to satisfy the requirements of RCW 10.73.170."[5] Gray timely appealed.

DISCUSSION

I. Standard of Review

¶ 8 The postconviction DNA testing statute articulates three requirements, some substantive and some procedural:
(2) The motion shall:
(a) State that:
(i) The court ruled that DNA testing did not meet acceptable scientific standards; or
(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
(b) Explain why DNA evidence is material to the identity of the perpetrator of... the crime ...; and
. . .
(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.
RCW 10.73.170; State v. Riofta, 166 Wash.2d 358, 363, 209 P.3d 467 (2009).
¶ 9 In construing a statute, the objective is to ascertain and give effect to the legislature's intent. State v. Jacobs, 154 Wash.2d 596, 600, 115 P.3d 281 (2005). If a statute uses plain language and defines essential terms, the statute is unambiguous. State v. Stivason, 134 Wash.App. 648, 651, 142 P.3d 189 (2006), review denied, 160 Wash.2d 1016, 161 P.3d 1027 (2007). If the statute is unambiguous, a court may not look beyond its plain meaning or consider legislative history; rather, the court must determine legislative intent through the plain meaning of the statute. Id.
¶ 10 RCW 10.73.170(2)(a) and (b) are procedural requirements relating to the motions form and content. Riofta, 166 Wash.2d 358, 363, 209 P.3d 467.[6] The substantive requirement of RCW 10.73.170(3) requires the convicted person to show the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis. Riofta, 166 Wash.2d 358, 366, 209 P.3d 467. As part of satisfying RCW 10.73.170(3), Gray must also carry the burden *965 on the matters pleaded under RCW 10.73.170(2). Whether the trial court correctly denied Gray's motion turns on whether Gray has established that DNA technology was not sufficiently developed to test the biological evidence at the time of his trial, or that the DNA testing now requested would provide significant new information; shown that the information is material to the identity of the perpetrator; and demonstrated a likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.
¶ 11 We review the trial court's application of the statutory standard for an abuse of discretion. Riofta, 166 Wash.2d 358, 368, 209 P.3d 467.

II. Evolution of DNA Testing: RCW 10.73.170(2)(a)(ii)

¶ 12 The DNA testing conducted in the early 1990s demanded a large and properly preserved sample of biological material. Cynthia E. Jones, Evidence Destroyed, Innocence Lost: The Preservation of Biological Evidence Under Innocence Protection Statutes, 42 AM.CRIM. L.REV. 1239, 1242 n. 18 (2005). Because no semen was present, the testing available at Gray's trial was not adequate to detect the DNA on C.S.'s underwear, or on the vaginal or anal swabs. Hair examination, which compared control hairs from the victims to hairs taken from the physical evidence, did not establish Gray as the assailant. DNA testing on the hairs was not conducted for trial, nor does the record establish that DNA testing of hair was available at the time of trial.
¶ 13 Gray argues that the new DNA testing method, short tandem repeats (STR), is much more accurate than restriction fragment length polymorphism (RFLP), the method available at the time of his trial. To buttress his argument, he cited scientific and legal literature discussing the advances in DNA testing, noting that STR testing has made it possible to test small amounts of previously untestable biological material contained in rape kits. Id. He also provides authority for his proposition that STR or mtDNA (mitochondrial) testing could be conducted on the hairs. Robert Aronson & Jacqueline McMurtrie, The Use and Misuse of High-Tech Evidence by Prosecutors: Ethical and Evidentiary Issues, 76 FORDHAM L.REV. 1453, 1470-71 (2007).
¶ 14 The State conceded in its trial brief that DNA testing technology has significantly advanced. However, the State responds that Gray has not met his burden under RCW 10.73.170(2)(a)(ii) regarding the swabs, because he has not shown that the technology exists to find the assailant's DNA on the vaginal and rectal swabs, given the overwhelming amount of C.S.'s DNA on the swabs. The State does not cite to any legal or scientific literature to support its argument. Furthermore, the State makes no argument relative to advances in DNA testing on hair samples or clothing.
¶ 15 We hold that Gray has satisfied RCW 10.73.170(2)(a)(ii).

III. Significant New Information: RCW 10.73.170(2)(a)(iii)[7]
¶ 16 In Riofta, the Supreme Court held that "the statutory language, `significant new information,' includes DNA test results that did not exist at the time of trial and that are material to the perpetrator's identity, regardless of whether DNA testing could have been performed at trial." 166 Wash.2d 358, 361, 209 P.3d 467.
¶ 17 The testing available at Gray's trial could not identify the source of any DNA on C.S.'s underwear or on the swabs. The scientific literature cited above indicates the new testing may be able to analyze DNA from biological trace material even without the presence of semen. The hair comparison analysis showed that none of the hairs taken from the victims matched Gray's but could not identify the donor. The DNA testing on the hairs would yield new information. Further, if the testing of swabs taken from C.S. and the hair sample found on R.J., who was held by the perpetrator while he raped C.S., *966 both revealed a DNA profile of someone other than Gray, this new information would be significant. The State provides no specific rebuttal on this point.
¶ 18 Gray has met the requirement of RCW 10.73.170(2)(a)(iii).

IV. Materiality: RCW 10.73.170(2)(b)

¶ 19 Gray asked the court to allow DNA testing on three groups of evidence: (1) clothing worn by C.S. and R.J.; (2) hairs recovered from the scene, the victims, and Gray; and (3) rectal and vaginal swabs taken from C.S. just after she was raped. Gray argues that the victims' clothing may have traces of skin cells; because the clothing has not been tested, the results may be material to the identity of the perpetrator. The assailant demanded that C.S. remove her clothing herself, and the record does not show the extent to which the perpetrator may have had direct contact with it. However, DNA from the assailant could have been transferred from C.S.'s body to her clothing when she dressed following the assault. DNA evidence from the underwear would be material, even if DNA evidence from the rest of her clothing might not be.
¶ 20 Although Gray requests testing on R.J.'s clothing, the record does not reflect whether it is available. R.J. was held by the assailant while he raped C.S.[8] However, even assuming that a new DNA profile was identified on R.J.'s clothing, that DNA evidence alone would not be material to the identity of the perpetrator.
¶ 21 Gray argues that DNA testing of the hair would be material to the identity of the perpetrator because there was a single perpetrator, and DNA evidence from another person would be material to the perpetrator's identity. The State responds that because Gray was already excluded as the source of the hairs based on hair comparison analysis during trial, DNA testing of the hairs would not be material to the identity of the perpetrator. Even if the hairs contained a DNA profile of someone other than Gray or the victims, the State explains, any number of innocent people could have deposited hairs on the victims or on the sleeping bags (from which the hairs were collected). This argument rings true as to the hair found on the sleeping bags and the victims' outerwear. However, the possibility exists that the hair found in the pubic combing of C.S. and the hair on R.J.'s clothing came from the same person. Such a match would be significant, particularly if it identified a male other than Gray or the two boys. If the DNA testing revealed this person was not Gray, the results would be material to the identity of the perpetrator.
¶ 22 Gray also requests testing on the vaginal and rectal swabs, arguing that if DNA other than C.S.'s is present, it will be material to the identity of the perpetrator. The State asserts that testing the vaginal and rectal swabs, when there is allegedly no semen or sperm on those swabs, would not be material to the identity of the perpetrator.
¶ 23 The scientific and legal literature supplied by Gray suggested semen or sperm may not be necessary to conduct DNA testing; skin cells may be enough. The absence of Gray's DNA from the swabs would not be material. Even the presence of a third person's DNA on the swabs or on any other evidence, considered individually, may appear to lack materiality. However, we must consider the possibility that the combination of the test results would identify the perpetrator. For example, if testing revealed a matching DNA profile from the swabs taken from C.S., and from R.J.'s clothing or hair taken from her clothing, this evidence would be clearly material to the identity of the perpetrator.
¶ 24 We hold that Gray has met his burden under RCW 10.73.170(2)(b).

V. Demonstrating Innocence on a More Probable than not Basis: RCW 10.73.170(3)

¶ 25 The legislative intent behind the 2005 amendment to RCW 10.73.170 was to broaden access to DNA testing. Riofta, 166 *967 Wash.2d 358, 363, 209 P.3d 467. Gray urges that the standard in 10.73.170(3)  "`the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis'"  is a "unique" standard, because of the legislature's addition of "likelihood" to the common more probable than not standard. Gray cites dictionary definitions equating "likelihood" to probability or chance. If "likelihood" means probability, then it is redundant of the more probable than not standard. Because courts must give effect to every word in a statute, Gray explains that the moving party must show only that there is a chance that DNA evidence would probably show the person is innocent.
¶ 26 The State responds that "likelihood" means probability, and that Gray has not shown that testing will demonstrate innocence on a more probable than not basis, because the evidence on which he was convicted was strong.[9] Because this statute applies to postconviction testing, the evidence will always have been sufficient to convict beyond a reasonable doubt. But whether the evidence in the original trial was strong or weak is only part of the question.
¶ 27 The Supreme Court has outlined a test, consistent with the mandate from the legislature, to assess the probability that new DNA evidence would be probative of innocence on a more probable than not basis. "To determine the probability that a petitioner could demonstrate his innocence with the aid of favorable DNA test results, courts must consider the evidence produced at trial along with any newly discovered evidence and the impact that an exculpatory DNA test could have in light of this evidence." Riofta, 166 Wash.2d 358, 368, 209 P.3d 467. Noting the legislature's use of the word "innocence," the Supreme Court explained the legislative intent to restrict the availability of postconviction DNA testing to a class of extraordinary cases, because to say a person is innocent suggests the State has convicted the wrong person. Id. at 368, n. 4, 209 P.3d 467. Hence, "[t]he statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator." Id. at 366, 209 P.3d 467.
¶ 28 In Riofta, the court declined to order testing on a white hat found on the sidewalk near the driveway where the assailant shot at the victim, even when the victim saw that the assailant was wearing it. Id. at 361, 209 P.3d 467. Even if Riofta obtained the DNA test results he sought  an absence of his DNA from the hat  the result would not be probative of his innocence. Id. at 368, 372, 209 P.3d 467. Because the shooter had come from a vehicle with other people in it, the court found that any of the other occupants could have worn the hat before the shooting, so the presence of other DNA profiles than Riofta's would not suggest his innocence. Id. at 360, 209 P.3d 467.
¶ 29 Unlike Riofta, here, only one person perpetrated this crime. The testing could yield various results. Gray could be identified with certainty as the perpetrator. The test could be inconclusive. Or, it could show that the DNA profiles from C.S.'s hair combings, underwear, or swabs matched the DNA profile of the hair sample taken from R.J.'s clothing, but did not match Gray's DNA profile. This would suggest Gray's innocence on a more probable than not basis.
¶ 30 Factually, this case is similar to In re Pers. Restraint of Bradford, 140 Wash.App. 124, 165 P.3d 31 (2007). Though that case *968 concerned the question of a new trial after the DNA test results were known, it bears on the question of probable innocence. In Bradford, the appellant requested through a personal restraint petition that the court reverse his convictions for rape and burglary based upon newly discovered DNA evidence. Id. at 126, 165 P.3d 31. Posttrial testing revealed DNA on the mask that was neither Bradford's nor the victim's; rather it belonged to an unidentified donor. Id. at 128, 165 P.3d 31. Because the victim had testified that the assailant repeatedly pushed the mask back over her eyes, the court was satisfied with the strength of the inference that Bradford was not the perpetrator and granted him a new trial. Id. at 132, 165 P.3d 31. Here, the assailant had intimate contact with one victim while holding the other victim at knife point. The presence of the same DNA profile on either the vaginal or anal swabs taken from C.S. and on any of the samples from R.J. would support a strong inference that the donor was the assailant. If that DNA profile does not match Gray's, it would be probative of his innocence on a more probable than not basis.
¶ 31 We hold that Gray has satisfied RCW 10.73.179(3).
¶ 32 We reverse the trial court's order denying Gray's motion for postconviction DNA testing and remand.
¶ 33 WE CONCUR: BECKER and LAU, JJ.
NOTES
[1] Both parties cite the State's motion and memorandum in opposition to defendant's motion for postconviction DNA testing for the facts. The only other source, albeit scarce, of facts in the record is the opinion this court filed on May 15, 1995.
[2] We use Gray's name in the facts, because he was convicted of the crime. However, we refer instead to the "assailant" or "perpetrator" in our postconviction testing analysis.
[3] C.S. wiped her genital area and urinated before swabs were taken.
[4] Gray also requested DNA testing of the sleeping bags on which the crimes occurred, but the sleeping bags no longer exist as evidence.
[5] The statute does not explicitly require that the court enter findings of fact, and the trial court made none.
[6] The State does not dispute that Gray has followed the statute's procedures for form.
[7] Although a petitioner need only meet one of the requirements listed in RCW 10.73.170(2)(a), Gray has pleaded two, so we evaluate both.
[8] A forensic scientist tested C.S.'s clothing and did not find traces of semen or other bodily fluid. Hair was recovered from R.J.'s clothing, but the record is unclear about whether other biological samples were obtained, or could be obtained, from her clothing.
[9] We note that much of the evidentiary basis on which Gray was convicted was circumstantial. The evidentiary basis for Gray's conviction consisted of two photographic montages, the two boys' in-court identifications of Gray, opinion testimony that the two boys were more positive about their pick from the second montage than the first, and bloodhound testimony that tracked his scent from the campsite to the spot of his arrest. Police also found a truck registered to Gray near the campsite shortly after the crime was reported. While all the signs might point to Gray, we cannot disregard the possibility of flawed evidence. For an example of eyewitness misidentification, see the Innocence Project's explanation of Ronald Cotton's case, where Cotton was improperly identified in a police lineup and in a photo identification, and DNA evidence later exonerated him. Innocence Project, Know the Cases, http://www.innocenceproject.org/Content/ 72.php (last visited May 19, 2009).