[No. 42173-9-II.    Division Two.    December 11, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. LINDSEY L. CRUMPTON, *Appellant*.

*Thomas E. Weaver Jr.*, for appellant.

*Russell D. Hauge, Prosecuting Attorney*, and *Randall A. Sutton, Deputy*, for respondent.

¶1 HUNT, J. — Lindsey L. Crumpton appeals the superior court's denial of his motion for postconviction deoxyribonucleic acid (DNA) testing under RCW 10.73.170. He argues that the superior court should have granted his motion because he showed a "high probability that DNA testing could identify the perpetrator of [the] rape." Br. of Appellant at 1. Citing the statute's plain language, the State responds

that Crumpton failed to show "a likelihood that the new DNA test results would demonstrate his innocence on a more probable than not basis." Br. of Resp't at 8. Applying the statutory standard, we hold that the superior court did not abuse its discretion in denying Crumpton's postconviction request for DNA testing under RCW 10.73.170; we affirm.

## FACTS

### I. BURGLARY AND RAPES

¶2 Twenty years ago, a jury convicted Lindsey L. Crumpton of five counts of first degree rape and one count of residential burglary of DE, a 75-year-old widow who lived alone in Bremerton. We affirmed his convictions in an unpublished opinion, in which we set forth the following pertinent facts:

> On April 10, 1993, D.E. went to bed around 10:00 p.m. She awoke at 3:15 a.m. [and] saw a man standing by the spare bed.

> The man grabbed D.E., threw her down on the floor between the two beds and stuck her head between the mattress and boxspring of her bed. He then picked her up and put her on the bed. He pulled her clothes down, covered her head with pillows and other bedding and raped her anally. He turned on the bedroom light and started searching through drawers and going through other rooms in the house.

> D.E. was raped five times that night, four times anally and once vaginally. In between each rape, the man rummaged through other rooms in the house. During the last episode, the man removed all of D.E.'s clothes, "rammed some handker-chiefs up [her] rear end and [her] front . . . [,] poured something cold on [her] and washed [her]." The handkerchiefs came from a nightstand in D.E.'s room.

> D.E. testified that she only saw the man's face for a couple seconds and after that her head was covered up. She did notice that he felt "greasy" and smelled of cologne.

> After the man left, D.E. stayed in bed for a couple of minutes[,] . . . put on a housecoat and went to a neighbor's

home. She arrived at the Bachelders around 5:15 a.m. and they called 911 dispatch. Janet Bachelder noticed that D.E. was barefoot, wearing a long robe, was not wearing her glasses or false teeth, and that she was trembling, frightened and "distraught." D.E. told her, "I've been raped."

Bachelder asked D.E. if he had hurt her and she said the man forced her to the floor and put her head under the mattress and put her back on the bed and that she was raped five times, "front and back." She was trembling and stammering while telling this. D.E. was only able to identify her attacker as "a big black man" and this information was relayed to 911. The paramedics and Bachelder took D.E. to the hospital. Bachelder noticed blood on the back of D.E.'s robe and on the sheets of the gurney at the hospital.

. . . .

David Hughes, a Bremerton patrolman, responded to a call to look for a rape suspect at 5:17 a.m. At 5:23, he noticed a heavy-set black male running across the street at D Street and National. As Officer Hughes turned the corner, he saw the man walking and noticed two napkins or cloth-like objects on the ground near him and saw him drop another item. Hughes ordered the man to stop. The man was wearing a leather jacket and no shirt. Hughes noticed that his skin was "wet looking" and that he smelled of cologne, and that he was "polite" and "acting a little nervous." . . .

Hughes asked Crumpton where he was going and he stated that he was coming from his sister's house and going to his mother's house. *Crumpton was holding a flowered print cloth, which resembled a pillowcase or blanket and appeared to have blood smears on it.* Hughes then placed Crumpton in the back seat of his car, called to report he had a subject who fit the description, and requested another officer.

Deputy Sheriff John Gese arrived and conducted a patdown search. He felt many objects in Crumpton's pockets and discovered a large quantity of *women's jewelry, a cigarette case and a ring case. Gese also noticed a large bulge in Crumpton's groin area, and asked him to remove what was inside. Crumpton pulled out three white handkerchiefs which appeared to be soiled and oily.* Gese told Crumpton he was being detained

because he matched the description of an assault suspect, and read Crumpton his rights. Gese handcuffed him and put him in his car. Gese also retrieved *a flannel sheet and a telephone cord* from Officer Hughes' car. Crumpton repeated that he was at his sister's and that he was on his way to his mother's house. He said the jewelry was his and that he was carrying it because he did not trust his sister. He also said he had the handkerchiefs because he had a cold and that he was taking the sheet to his mother's to wash.

Investigation revealed that the front door of D.E.'s house had been forced open. The bedroom was in "complete disarray." Drawers had been pulled out and items were scattered about. A telephone cord in the hall had been cut. A bottle of Crisco oil was found on a dresser in D.E.'s bedroom and the cap and tamper-resistant seal were also recovered there. A soaked handkerchief with a reddish stain was also discovered.

Any fingerprints that were obtained were mostly smudges and had no usable value. Apparently, the presence of liquids can delete or smudge fingerprints and hinder efforts to obtain good prints. Detective Abille testified that there was too much of an oily substance at the scene to obtain fingerprints.

*The sheet taken from Crumpton matched the sheet on D.E.'s bed. D.E. also identified the jewelry, cigarette case, handkerchiefs and other items.*

Belinda Mier, a forensic serologist, testified that a nonsecretor is one who does not secrete blood group substance in body fluids. She stated that roughly one-quarter of the population, including both blacks and whites, are nonsecretors. Crumpton is a nonsecretor.

She testified that no sperm was found on the vaginal swab. Sperm was discovered on the rectal swab. However, it could not be determined from the sample whether the donor was a secretor or a non-secretor. Two stains on a sheet were examined for semen. Both stains contained acid phosphatase, an enzyme that is a component of both semen and vaginal fluid. Sperm was found on both stains, but P-30 (which is specific to semen) was detected on only one of the stains. Mier stated that if a blood type is not detected from a semen stain, it is because either the sample was too small or the donor is a nonsecretor.

Hairs were collected from D.E.'s bedroom. One of the hairs from the mattress matched the characteristics of a pubic hair sample taken from Crumpton.

A CrR 3.5 hearing was held and Crumpton's statements to the officer were not suppressed. Crumpton was found guilty of five counts of first degree rape and one count of residential burglary.

*State v. Crumpton*, noted at 82 Wn. App. 1015, slip. op. at 2-7 (emphasis added) (some alterations in original), *review denied*, 130 Wn.2d 1018 (1996).

## II. RCW 10.73.170 PETITION

¶3 Eighteen years later, Crumpton petitioned for RCW 10.73.170 postconviction DNA testing of items from the victim's "rape kit," and a flannel sheet, two white handkerchiefs, and hairs collected at the scene. Clerk's Papers (CP) at 28. The State conceded that Crumpton had met RCW 10.73.170(2)'s preliminary pleading requirements.[1]

¶4 Accepting the State's concession, the superior court considered whether Crumpton had "shown 'the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.'" CP at 62 (quoting RCW

---

[1] RCW 10.73.170(1) and (2) provide the following preliminary pleading requirements:

(1) A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.

(2) The motion shall:

(a) State that:

(i) The court ruled that DNA testing did not meet acceptable scientific standards; or

(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or

(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;

(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and

(c) Comply with all other procedural requirements established by court rule.

10.73.170(3)). Remarking that the evidence presented at trial was "factually strong," the superior court entered written findings of fact and conclusions of law. CP at 62 (Finding of Fact (FF) I). The superior court noted that "Crumpton's argument . . . that the Court must presume that the DNA testing would be both favorable and exculpatory [was] essentially the same argument that was put forth by the dissenting justices in *Riofta*,[2]" which view the "majority opinion . . . rejected . . ." and held instead that the statute " 'asks a defendant to show a reasonable probability of his innocence before requiring State resources to be expended on a test.' " CP at 64 (Conclusion of Law (CL) IV) (quoting *Riofta*, 166 Wn.2d at 369-70 (citing RCW 10.73.170(3))).[3]

¶5 The superior court concluded that Crumpton had "failed to show a 'reasonable probability of his innocence' " or "the 'likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.' " CP at 64 (CL III) (quoting RCW 10.73.170(3)). Thus, it denied Crumpton's motion for postconviction DNA testing. Crumpton appeals.

## ANALYSIS

¶6 Crumpton argues that the superior court erred in denying his motion for DNA testing under RCW 10.73.170 because he showed a "high probability that DNA testing could identify the perpetrator of [the] rape." Br of Appellant

---

[2] *State v Riofta*, 166 Wn.2d 358, 209 P.3d 467 (2009).

[3] Of particular note are the following additional conclusions of law: " 'In contrast to the statute's lenient procedural requirements, its substantive standard is onerous.' " CP at 63 (CL II) (quoting *Riofta*, 166 Wn.2d at 367). This "onerous substantive standard is not met merely by the defendant's showing that favorable DNA results might be obtained." CP at 63 (CL II). Crumpton, therefore, has "failed to meet the substantive requirements of RCW 10.73.170(3)" for "DNA testing at State expense." CP at 64 (CL III).

at 1. Citing *Riofta*, 166 Wn.2d at 367-68,[4] Crumpton characterizes the Supreme Court's 2009 explanation of this statutory requirement as follows:

"In determining whether a convicted person 'has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis,' a court must look to whether, viewed in light of all of the evidence presented at trial or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis. The statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator."

Br. of Appellant at 5 (emphasis omitted) (quoting *Riofta*, 166 Wn.2d at 367-68 (quoting RCW 10.73.170(3))). The Supreme Court's explanation of the statutory test in both *Riofta* and its recent decision in *Thompson*[5] (which Crumpton cites as additional authority), quoting *Riofta*, characterizes the statutory requirement as follows:

"[A] court must look to whether, viewed in light of all of the *evidence presented at trial* or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis."

*Thompson*, 173 Wn.2d at 872-73 (alteration in original) (quoting *Riofta*, 166 Wn.2d at 367 (citing RCW 10.73.170(3))). Applying the *Riofta/Thompson* test in light of the abuse of discretion standard of review, we affirm the superior court's denial of Crumpton's request for postconviction DNA testing under RCW 10.73.170.

---

[4] Crumpton also cites two decisions from Division One of our court, *State v. Thompson*, 155 Wn. App. 294, 229 P.3d 901 (2010), *aff'd*, 173 Wn.2d 865, 271 P.3d 204 (2012), and *State v. Gray*, 151 Wn. App. 762, 215 P.3d 961 (2009).

[5] *State v. Thompson*, 173 Wn.2d 865, 271 P.3d 204 (2012).

I. Standard of Review

■ ¶7 As our Supreme Court recently noted:

[W]e review a trial court's decision on a motion for post-conviction DNA testing for abuse of discretion. *Riofta*, 166 Wn.2d at 370. A trial court abuses its discretion when an order is manifestly unreasonable or based on untenable grounds. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). "A discretionary decision 'is based "on untenable grounds" or made "for untenable reasons" if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.' " *Id.* (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995))).

*Thompson*, 173 Wn.2d at 870.[6] We find no abuse of discretion here.

II. RCW 10.73.170(3)

■ ¶8 RCW 10.73.170(3) provides:

The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown *the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.*

(Emphasis added.) Addressing RCW 10.73.170(3)'s requirements, our Supreme Court stated:

In determining whether a convicted person "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis," a court must look to whether, viewed in light of all of the evidence presented at trial or newly discovered, *favorable* DNA test results would raise the

---

[6] We further note, as the dissent in *Thompson* explained, the primary issue there was "whether statements that were inadmissible or not admitted at trial can be considered in deciding whether to grant a postconviction request for DNA testing." 173 Wn.2d at 888 (Madsen, C.J., dissenting).

likelihood that the person is innocent on a more probable than not basis. The statute requires a trial court to grant a motion for postconviction testing when *exculpatory* results would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator.

. . . .

Comparable to the federal law, our statute requires petitioners to demonstrate that *favorable* DNA results could lead to the production of evidence that would raise a *reasonable probability of innocence*. RCW 10.73.170(3) ("likelihood that DNA evidence would demonstrate innocence on a more probable than not basis").

To determine *the probability that a petitioner could demonstrate his innocence* with the aid of favorable DNA test results, courts must consider the evidence produced at trial along with any newly discovered evidence and the impact that an exculpatory DNA test could have in light of this evidence.

*Riofta*, 166 Wn.2d at 367-69 (emphasis added and omitted) (footnotes and citations omitted).

¶9 More recently, our Supreme Court issued *Thompson*, "implicat[ing]" RCW 10.73.170(3), quoting the statutory language verbatim, and quoting its earlier articulation of the test in *Riofta*.[7] *Thompson*, 173 Wn.2d at 871, 872.[8] A split Supreme Court affirmed Division One's reversal of the

---

[7] The dissent in *Thompson* also paraphrased the statutory language as follows: "[T]he proper focus of a court deciding a postconviction motion for DNA testing is on whether the defendant has made the required showing of actual innocence. This means establishing on a more probable than not basis that the wrong person was convicted." *Thompson*, 173 Wn.2d at 876-77 (Madsen, C.J., dissenting). Thus, despite the five-to-four split in the outcome, all nine justices in *Thompson* essentially agreed that the statutory test for granting a postconviction request for DNA testing was whether the requesting defendant "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

[8] Crumpton notes: "RCW 10.73.170 provides a mechanism for people with older convictions to seek DNA testing in order to establish actual innocence." Br. of Appellant at 3. As our Supreme Court explained in *Riofta*:

Our statute was drafted to qualify Washington for federal funding under the Justice For All Act of 2004. Pub. L. No. 108-405, 118 Stat. 2260, 2261-62. In order to qualify for funding under the act, Washington must provide postconviction DNA testing "in a manner comparable to" the federal postconviction DNA testing

trial court's denial of Thompson's request for postconviction DNA testing because, in ruling that "the defendant did not show a 'likelihood that the DNA evidence would demonstrate the defendant's innocence,'" the trial court had erroneously taken into consideration Thompson's admission of consensual sex with the victim; this evidence had not been presented to the jury and, therefore, according to the *Thompson* majority, it should not have borne on the trial court's decision. *Thompson*, 173 Wn.2d at 871. Nevertheless, the Court reiterated the test that it had articulated in *Riofta*:

> "[A] court must look to whether, viewed in light of all of the *evidence presented at trial* or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis." *Riofta*, 166 Wn.2d at 367 (emphasis added) (citing RCW 10.73.170(3)).

*Thompson*, 173 Wn.2d at 872-73 (alteration in original). Accordingly, we review the superior court's decision here against this test.

■ ¶10 At the outset, we note the Supreme Court's admonition in *Riofta*: "RCW 10.73.170 is not aimed at ensuring a defendant had a fair trial. Its purpose is to provide a remedy for those who were wrongly convicted *despite* receiving a fair trial. The inquiry therefore properly focuses on

---

outlined in 18 U.S.C. § 3600(a). Pub. L. No. 108-405, 118 Stat. at 2285. Under the federal statute, an inmate can obtain postconviction DNA testing by showing, inter alia, that the testing "may produce new material evidence" that would "support [a] theory" of innocence and "raise a reasonable probability that the applicant did not commit the offense." 18 U.S.C. § 3600(a)(6), (8)(A), (B).

The purpose of both statutes is to provide a means for a convicted person to obtain DNA evidence that would support a petition for postconviction relief. *United States v. Boose*, 498 F. Supp. 2d 887, 889-90 (N.D. Miss. 2007) ("The Innocence Protection Act gives a defendant in the right circumstances the means to initiate tests which may prove that he is *actually innocent* of the crime of his conviction.").

Comparable to the federal law, our statute requires petitioners to demonstrate that favorable DNA results could lead to the production of evidence that would raise a reasonable probability of innocence. RCW 10.73.170(3) ("likelihood that DNA evidence *would demonstrate* innocence on a more probable than not basis" (emphasis added)).

*Riofta*, 166 Wn.2d at 368-69 (alteration in original) (footnote and citation omitted).

petitioner's innocence." 166 Wn.2d at 369 n.4. Consistent with this admonition, the Court further commented:

> [O]ur statute does not allow defendants to adopt a "wait and see" approach. A defendant's failure to request DNA testing at trial of evidence he now claims to be exculpatory must be weighed against his claim of probable innocence unless circumstances exist to justify the failure.

*Riofta*, 166 Wn.2d at 368 n.3.

¶11 We agree with the State that here, "when combined with the other evidence, [a DNA test] simply does not raise an inference of innocence."[9] Br. of Resp't at 17. Although the victim did not get a good look at her rapist's face, (1) she reported that he felt "greasy" and smelled of cologne, and she described him as a "big black man," which fit Crumpton's description when police found him running

---

[9] Our Supreme Court elaborated on this "innocence" test:

> To determine the probability that a petitioner could demonstrate his innocence with the aid of favorable DNA test results, *courts must consider the evidence produced at trial* along with any newly discovered evidence *and the impact that an exculpatory DNA test could have in light of this evidence.*

*Riofta*, 166 Wn.2d at 369 (emphasis added). In a footnote immediately following this text, the Court noted:

> The legislature's use of the word "innocence" indicates legislative intent to restrict the availability of postconviction DNA testing to a limited class of extraordinary cases where the results could exonerate a person who was wrongfully convicted of a crime. See Sawyer v. Whitley, 505 U.S. 333, 340, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992) (to say a person is "innocent" means the State has convicted the wrong person of the crime).

*Riofta*, 166 Wn.2d at 369 n.4 (emphasis added).

We respectfully disagree with the dissent's position that, in deciding whether to grant a request for postconviction DNA testing under RCW 10.73.170, the trial court must, in essence, presume that such testing would be favorable. The effect of presuming favorable DNA test results would be to mandate postconviction DNA testing in response to every request, contrary to the legislature's express statutory language requiring the trial court to grant such a request *only* if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). If the legislature had meant to require postconviction DNA testing to each convicted felon seeking it, then it would have simply said so instead of vesting decision-making discretion in the trial courts.

near her home shortly after the rapes early in the morning;[10] (2) police found Crumpton in possession of the rag he had used to wipe oil on the victim to obliterate semen evidence and items he had stolen from her, including handkerchiefs, jewelry, a flowered-print bedding cloth with blood smears, a flannel sheet, a telephone cord, a cigarette case, and a ring case; (3) Crumpton admitted that he had been in the victim's home (although he denied having raped her); (4) there was no evidence that the victim had been raped by more than one man; (5) one of the pubic hairs seized from the scene exhibited the same microscopic characteristics as Crumpton's; and (6) Crumpton's explanations to the police about where he had been and where he had obtained the victim's personal possessions were clearly lies.

¶12 In short, DNA testing here would not likely change the outcome. First, finding DNA other than Crumpton's is unlikely in light of DE's living alone and not having reported any sexual encounter other than his attack. Second, even if testing identified another's DNA, it would show only the possibility that the victim had sex with someone other than Crumpton before or after he raped her. Thus, even if we assume that DNA testing would not reveal the presence of Crumpton's DNA, the jury likely would still have convicted him based on the other overwhelming evidence admitted at trial. As the superior court noted, "[E]ven . . . favorable test result[s] would not [have] exonerate[d]" Crumpton. CP at 57. Or, paraphrased in the Supreme Court's words, even if DNA test results were "favorable," Crumpton could not meet the statutory standard requiring him to show the " *'likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.'* " *Riofta*, 166 Wn.2d at 367 (quoting RCW 10.73.170(3)).[11]

---

[10] *Crumpton*, slip op. at 3.

[11] The dissent asserts that our approach is "contrary to *Thompson* and *Riofta*, neither of which assessed the likelihood of a second conviction in a retrial." Dissent at 424. We respectfully respond that the dissent's approach—requiring a

¶13 In response to the dissent, we reiterate that the standard of review here is abuse of discretion: whether under the circumstances of this case the superior court's denial of Crumpton's request for postconviction DNA testing was manifestly unreasonable or based on untenable grounds where Crumpton failed to show " 'the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.' " *Thompson*, 173 Wn.2d at 870-71 (quoting RCW 10.73.170(3)). We hold that the superior court did not abuse its discretion in denying Crumpton's post-conviction request for DNA testing under RCW 10.73.170 because " 'viewed in light of all of the evidence presented at trial or newly discovered, [not even] favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis.' " *Thompson*, 173 Wn.2d at 872-73 (emphasis omitted) (quoting *Riofta*, 166 Wn.2d at 367). Accordingly, we affirm.

VAN DEREN, J., concurs.

¶14 WORSWICK, C.J. (dissenting) — Lindsey Crumpton is entitled to postconviction DNA (deoxyribonucleic acid) testing under RCW 10.73.170 and *State v. Thompson*, 173 Wn.2d 865, 872-73, 271 P.3d 204 (2012) (quoting *State v. Riofta*, 166 Wn.2d 358, 367, 209 P.3d 467 (2009)). Therefore, I respectfully dissent.

---

nonstatutorily prescribed presumption that a DNA test result would be favorable—subverts the legislature's explicit prerequisite for obtaining a post-conviction DNA test at public expense.

The right to a postconviction DNA test is statutory, not constitutionally mandated; thus, the statute prescribes the requirements. These requirements do not include any presumption of favorable DNA test results. Rather, the legislature has placed an affirmative burden on *"the convicted person [to show]* the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3) (emphasis added). As the Supreme Court noted, this burden is a high one because, in deciding whether to grant the request, the court must view the request " 'in light of all of the evidence presented at trial or newly discovered.' " *Thompson*, 173 Wn.2d at 872-73 (emphasis omitted) (quoting *Riofta*, 166 Wn.2d at 367).

¶15 The majority cites the correct rule for evaluating Crumpton's motion: we look to whether, viewed in light of all of the evidence presented at trial, *favorable* DNA test results would raise the likelihood that the convicted person is innocent on a more probable than not basis. But the majority misapplies the rule, basing its decision on the strength of the evidence presented at trial and its conclusion that DNA evidence is unlikely to help Crumpton. This approach leads the majority to incorrectly deny Crumpton a postconviction DNA test.

## I. Presumption of a Favorable Test

¶16 This is a horrific crime, and the evidence against Crumpton is strong. But the evidence of guilt is *always* strong in a motion for postconviction DNA testing because the convicted person making the motion has already been found guilty beyond a reasonable doubt. *State v. Gray*, 151 Wn. App. 762, 773, 215 P.3d 961 (2009). Thus, the majority's reliance only on the *strength* of the evidence against Crumpton is misplaced.

¶17 To evaluate a motion for postconviction DNA testing, we cannot look to the evidence merely to determine whether it was sufficient to convict the defendant. *Gray*, 151 Wn. App. at 773. Instead, we look to see how the evidence stands up in the presence of a favorable DNA test. *See Thompson*, 173 Wn.2d at 875 & n.3; *Gray*, 151 Wn. App. at 773 n.9.

¶18 RCW 10.73.170(3) provides that "[t]he court shall grant" a procedurally proper motion for DNA testing if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." Our Supreme Court has already interpreted and applied this statute:

> In determining whether a convicted person "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis," a court must look to

whether, viewed in light of all of the evidence presented at trial or newly discovered, *favorable* DNA test results would raise the likelihood that the person is innocent on a more probable than not basis. The statute requires a trial court to grant a motion for postconviction testing when *exculpatory results* would, in combination with the other evidence, raise a reasonable probability the [convicted person] was not the perpetrator.

*Riofta*, 166 Wn.2d at 367-68 (emphasis added and omitted) (quoting RCW 10.73.170(3)). The court weighing this motion *must presume* that the DNA test results would be favorable to the convicted person's claim of actual innocence. *Riofta*, 166 Wn.2d at 367-68.

¶19 Declining to make this presumption, the majority states that "finding DNA other than Crumpton's is unlikely in light of [evidence presented at trial]."[12] Majority at 420. Whether a favorable result is likely or unlikely has no part in our evaluation of Crumpton's motion. Our obligation is to focus on whether a *favorable* test raises the likelihood of innocence. We are not to speculate on the results of the test.

¶20 The majority, in rejecting the *Riofta* presumption, additionally states that every motion for postconviction DNA testing would be granted if trial courts presume that the DNA test results would be favorable to the convicted person. I respectfully disagree. Our Supreme Court presumed favorable test results and still denied the motion in *Riofta*, explaining that "[n]either the absence of Riofta's DNA nor the presence of another's DNA on the [evidence] would raise a reasonable probability of his innocence." 166 Wn.2d at 373. More importantly, *Riofta*'s articulation of the statutory standard is binding on this court.

---

[12] The majority states that Crumpton used an oily rag "to obliterate semen evidence." Majority at 419-20. This statement lacks evidentiary or scientific support. Nothing in the record suggests that vegetable oil would obliterate semen or the DNA it contains. To the contrary, a forensic serologist testified at Crumpton's trial to the *presence* of semen on the swab and bedsheet.

II. APPLICATION OF THE *RIOFTA* PRESUMPTION TO CRUMPTON'S MOTION

¶21 I agree with the majority that the convicted person's innocence is the proper focus of the court's inquiry. *Riofta*, 166 Wn.2d at 369 n.4. But I disagree with the majority's conclusion that Crumpton cannot show the likelihood that a *favorable* DNA test could not demonstrate his innocence on a more probable than not basis.

¶22 The majority states that "even if we assume that DNA testing would not reveal the presence of Crumpton's DNA, the jury likely would still have convicted him based on the other overwhelming evidence admitted at trial." Majority at 420. But we must be mindful that "the procedure for ordering DNA testing under RCW 10.73.170 is not akin to retrying the case." *Thompson*, 173 Wn.2d at 873. Instead, Crumpton's motion is a means of obtaining newly discovered evidence that could lead to a new trial, if the test results are actually favorable. *Riofta*, 166 Wn.2d at 368. Thus the majority's approach is contrary to *Thompson* and *Riofta*, neither of which assessed the likelihood of a second conviction in a retrial.

¶23 Finally, I disagree with the majority's assertion that even favorable test results would not have exonerated Crumpton. This statement is directly contrary to *Thompson*, 173 Wn.2d at 875. This court does not look to see whether favorable DNA test results would exonerate Crumpton, but looks only to whether favorable results would *raise the likelihood* that Crumpton is innocent on a more probable than not basis. *Riofta*, 166 Wn.2d at 367.

¶24 Here, all the evidence suggests that one rapist committed this crime. Crumpton's motion asserts that the rapist's DNA may be present in three types of biological evidence: the rapist's semen found on a rectal swab and a stained bedsheet, pubic hairs recovered from the mattress, and a bloodstained handkerchief.

¶25 DNA testing of the semen would determine whether or not Crumpton is its source. Given that there was one rapist, a result showing that the semen belonged to a man other than Crumpton would demonstrate that Crumpton is, more probably than not, innocent of the rape.[14] *See Thompson*, 173 Wn.2d at 875; *Gray*, 151 Wn. App. at 774. Further, DNA testing of the hairs and any blood on the handkerchief could show that they came from the same source as the semen. If that source is a person other than Crumpton, the test results would enhance the likelihood that Crumpton is probably innocent.

¶26 Thus, I disagree with the majority's conclusion that even favorable test results would be unavailing to Crumpton in light of the strong circumstantial evidence against him. Instead, favorable test results would require viewing all the evidence in a different light because the evidence would no longer support an inference that Crumpton is the rapist. Though favorable results may be unexpected, postconviction DNA testing has exonerated individuals who were found guilty on the basis of eyewitness identifications,[15] microscopic hair comparisons,[16] and even their own inculpatory statements.[17]

¶27 I would reverse and order DNA testing.

Review granted at 177 Wn.2d 1015 (2013).

---

[14] The majority's statement that "even if testing identified another's DNA, it would show only the possibility that the victim had sex with someone other than Crumpton before or after he raped her" is made without the benefit of argument by either party or a verbatim report of proceedings of the trial. Majority at 420. The information presented to us is that there was one rapist. The record is silent as to the sexual activity of the victim.

[15] *See Riofta*, 166 Wn.2d at 371 (quoting Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 60 (2008)).

[16] NAT'L RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 160 (2009).

[17] *In re Pers. Restraint of Bradford*, 140 Wn. App. 124, 126, 165 P.3d 31 (2007) (reversing a petitioner's convictions for first degree rape and first degree burglary in light of exculpatory DNA test results, even though the petitioner had confessed to the crimes).