[No. 16756-5-II. Division Two. November 16, 1995.]

THE STATE OF WASHINGTON, *Appellant*, v. MICHAEL G. RUNDQUIST, *Respondent*.

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for appellant.

*Brett A. Purtzer* and *Law Offices of Monte E. Hester*, for respondent.

WIGGINS, J. — Michael G. Rundquist was charged with six counts of knowingly purchasing unlawfully taken salmon and six counts of knowingly purchasing unlawfully taken steelhead. After three days of testimony in a jury trial, the trial court interrupted the State's case-in-chief and dismissed all charges on the ground that outrageous conduct by the government agents had deprived the defendant of his right to due process of law. The court also held that the government had entrapped the defendant into committing the offense. We hold that the governmental conduct was not so outrageous as to shock the sense of universal justice inherent in due process of law. We also hold that entrapment was a jury issue, which could not be determined by the trial court before the prosecution rested. We reverse and remand for trial.

## FACTS

In late 1989, an informant told state agents about a

thriving business in the purchase and sale of illegally caught fish in Washington. The Washington State Department of Fisheries, the Washington State Department of Wildlife, and the United States Fish and Wildlife Service pooled their funds, resources, and expertise in order to determine the scope of the illegal market and to put an end to the market.

Agent Bill Hebner, of the Washington State Department of Wildlife, formed an undercover company, licensed as Admiralty Fish Company, to carry out the investigation. The undercover team used a truck equipped to run a mobile fish buying company. Mike Quall, an informant, worked with the agents to set up the fish deals.

Agent Hebner first met defendant Rundquist when Hebner sold legal fish eggs to Rundquist. The two men discussed the possibility of future fish transactions. The agent told Rundquist that if he "were to engage in illegal activity that [he] did not want a paper trail existing with the illegal product." "[Rundquist] agreed and said that he never made any kind of paperwork on those kinds of deals and that in the future if [they] did that kind of business [they] shouldn't do it in town, it should be done at his house in the privacy of his neighborhood."

The State presented evidence at trial that Rundquist purchased allegedly illegal fish eggs from Hebner on at least two separate occasions. Agent Hebner purchased the fish from Nisqually tribal member Albert Squally. The State sought to prove that the fish were caught by Squally during seasons closed to salmon fishing. The fishing season in the Nisqually River opened and closed on a schedule set by the Fisheries Advisory Board, composed of representatives from the Nisqually Indian Tribe and the State of Washington. The evidence relating to the purchases was as follows.

Counts I and II. The Nisqually River was closed to fishing from noon on January 24, to noon on January 28, 1990. On January 27, 1990, Hebner went to Squally's residence where he observed two large bins of fresh fish. He believed

the fish were caught out of season from the Nisqually. He did not see the fish caught. He purchased ninety-six chum salmon and seven steelhead at market value. He did not fill out any fish tickets on these fish. Purchasers of fish for commercial use are required to fill out fish tickets documenting the time and location of purchase. *See* chapter 220-69 WAC.

■ Hebner testified that he was experienced in examining fish and testified as to his method of determining whether the fish were fresh or not. Ascertaining the date the salmon were killed was critical to determine if the fish were legally purchased. On January 27, the agent purchased the salmon and steelhead approximately sixteen hours before the season reopened. Hebner testified to his observations that the fish were fresh, but the trial court excluded Hebner's opinion of how recently the fish had been caught. In reviewing the defense motion to dismiss for outrageous government conduct, we will grant all inferences in favor of the State, the nonmoving party, and assume that the fish had been caught out of season.[1]

After the fish were purchased, Hebner and two others cleaned the fish and removed the fish eggs. On the next day, January 28, 1990, Hebner and Quall met with Rundquist. The eggs were transported in Hebner's undercover vehicle to meet with Rundquist. Hebner told Rundquist that he had illegal fish eggs for sale and that he was concerned about leaving a paper trail. Rundquist agreed to purchase the fish. After Hebner asked for cash, Rundquist offered to give Hebner a check and then buy back the check the next day.

On January 29, 1990, Rundquist bought back the check

---

[1]*Cf. State v. Uglem*, 68 Wn.2d 428, 432, 413 P.2d 643 (1966) (" 'A challenge to the sufficiency of the evidence *or a motion having that effect* admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and requires that the evidence be interpreted most strongly against the challenger or movant and in the light most favorable to the opposing party . . . .' " (emphasis added) (quoting *State v. Reynolds*, 51 Wn.2d 830, 833, 322 P.2d 356 (1958) (quoting *State v. Lutes*, 38 Wn.2d 475, 481, 230 P.2d 786 (1951)))).

with cash. The agent reiterated to Rundquist that the fish were illegal because the fish were closed season and no fish tickets had been prepared.

Counts III and IV. The Nisqually River was closed to fishing from noon on January 31, until noon on February 4, 1990. On February 4, 1990, Hebner traveled to Squally's residence and observed fresh fish at Squally's residence in large bins. He arrived at the residence at 11:20 A.M., forty minutes before the opening of the legal fish season. (Thus the fish were likely out of season fish.) Squally was not home so Hebner went to the Nisqually landing, where Squally was fishing. He purchased eighteen chum salmon and four steelhead from Squally during the afternoon. As Squally was fishing during the open season these fish presumably were legal.

Later that afternoon, Hebner returned to Squally's residence and purchased twenty-one chum salmon and five steelhead. He purchased what he believed to be the fish that he had observed that morning. He had no personal knowledge that it was those fish. Thus, he purchased a mix of legal fish and what he believed to be illegal fish. He filled out treaty Indian fish receiving tickets for the fish purchased at Squally's home and at the landing. The fish were cleaned, with the legal and illegal eggs segregated. On Hebner's request, Quall called Rundquist and set up a meeting to purchase the eggs, informing him that half the eggs were legal. Hebner met with Rundquist and told him that he had two sets of eggs, one set purchased during the open season and the other during the closed season. Rundquist purchased all the eggs.

Counts V through XII. The trial judge interrupted the case before the prosecution could present evidence on the remaining counts. The trial judge expressed his opinion that, "The whole idea was conceived by this gentleman [agent Hebner], if I dare call you that, sir, sitting on the witness stand now." The prosecutor explained that the investigation was controlled and approved at high levels of state and federal government, in constant consultation

with state and federal prosecutors. The investigation led to dozens of prosecutions in state and tribal courts, including Squally's conviction in tribal court on thirty counts. The judge responded that he believed that Rundquist was guilty of buying illegal fish, but that the government's conduct was so "shocking" that it violated due process and constituted entrapment. The judge announced that he would dismiss the entire proceeding for a violation of due process and as an entrapment.

The trial court later entered findings of fact that are inconsistent with the court's conclusions of law. The court found that agent Hebner never saw the fish caught and had no personal knowledge when the fish were caught, and that Rundquist had no personal knowledge whether the fish eggs were legal or illegal. But the court concluded as a matter of law that the fish were illegally caught, and that the agents' conduct violated due process and entrapped defendant Rundquist.

## Analysis

### Timeliness of Appeal

The court entered written findings and conclusions six months after the verbal order of dismissal. The State filed notices of appeal nine days before the written findings and eleven days after the written findings. The trial court eventually entered a written order of dismissal ten months later. The State did not file a new or amended notice of appeal from the order of dismissal.

■ Defendant Rundquist argues that this court lacks jurisdiction to consider the appeal because the State failed to appeal within thirty days of the trial court's verbal order dismissing the charges. We reject this argument because a party need not appeal from a verbal dismissal until the trial court enters a written order of dismissal.[2]

Rundquist next argues that the appeal is untimely because the State failed to file a new notice of appeal from

---

[2]RAP 2.2(a)(1). *See State v. Dailey*, 93 Wn.2d 454, 458-59, 610 P.2d 357 (1980).

the order of dismissal. We reject this argument because the State was not required to file a new notice of appeal. The earlier notices were prematurely filed. RAP 5.2(g) cures any defect in premature notices by providing that, "A notice of appeal . . . filed after the announcement of a decision but before entry of the decision will be treated as filed on the day following the entry of the decision."

## Outrageous Government Conduct

 We analyze the dismissal of this prosecution under CrR 8.3(b), which provides, "The court on its own motion in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution and shall set forth its reasons in a written order." We review dismissals under this rule for abuse of discretion, and we find abuse "when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons."[3] Three steps are included in this analysis: first, the court has acted on untenable grounds if its factual findings are unsupported by the record; second, the court has acted for untenable reasons if it has used an incorrect standard, or the facts do not meet the requirements of the correct standard; third, the court has acted unreasonably if its decision is outside the range of acceptable choices given the facts and the legal standard.[4]

The factual prong of the abuse of discretion standard is problematic in this case, because the trial court dismissed the prosecution before the State rested its case without giving the State the opportunity to complete its proof. Under the circumstances, we will interpret the facts most favorably to the state, treating the motion as equivalent to a motion to dismiss for insufficiency of the evidence.[5]

 Washington courts have stated that a prosecution

---

[3]*State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

[4]1 Washington State Bar Ass'n, *Washington Appellate Practice Deskbook* § 18.5 (2d ed. 1993).

[5]*Cf. State v. Uglem*, 68 Wn.2d at 432; *see* case quoted *supra* n.1.

may violate the due process clause if government conduct is sufficiently outrageous: "Such conduct must be so outrageous that it violates the concept of fundamental fairness inherent in due process and shocks the sense of universal justice mandated by the due process clause."[6] But no Washington decision has dismissed a prosecution for outrageous conduct by government agents.

The defense of outrageous government conduct originated in concurring and dissenting opinions in United States Supreme Court entrapment cases. In the 1973 decision in *United States v. Russell*,[7] Justice Rehnquist, writing for the majority, conceded that the Court might someday be confronted with a situation in which the conduct of law enforcement officials was so outrageous that due process principles would absolutely bar the government from invoking the judicial process to obtain a conviction. Three years after *Russell*, Justice Rehnquist, writing for the plurality, appeared to repudiate the outrageous conduct doctrine. In *Hampton v. United States*,[8] Justice Rehnquist wrote that entrapment was the only available defense against outrageous conduct by government agents. Justice Rehnquist quoted from *Russell* that the defense of entrapment is not intended "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve."[9] Justices Powell and Blackmun, concurring in the judgment, agreed that entrapment was a matter of predisposition and that the government's conduct in the *Hampton* case did not violate the defendant's right to due process. But they refused to rule out the possibility of a due process violation in another case and did not support the view that

---

[6]*State v. Pleasant*, 38 Wn. App. 78, 82, 684 P.2d 761, *review denied*, 103 Wn.2d 1006 (1984); *see also State v. Putnam*, 31 Wn. App. 156, 162, 639 P.2d 858, *review denied*, 97 Wn.2d 1018 (1982).

[7]411 U.S. 423, 431, 432, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) ("[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles [are violated.]")

[8]425 U.S. 484, 489-91, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976).

[9]425 U.S. at 490 (quoting *Russell*, 411 U.S. at 435).

predisposition to commit a crime invariably forecloses a due process defense.[10] A majority of the Supreme Court has never approved of the outrageous conduct defense.[11]

The First Circuit has aptly observed that "The banner of outrageous misconduct is often raised but seldom saluted," pointing out that since *Hampton* only one federal appellate court has granted relief to a criminal defendant for outrageous conduct.[12] More specifically, we cannot find that any court, other than the trial court in this case, has ever dismissed a prosecution for fish or wildlife violations under the outrageous conduct doctrine. Courts have refused to allow the defense where: police sold allegedly illegal fish to a restaurant;[13] a federal agent illegally shot foxes from the defendant guide's aircraft;[14] federal agents sold illegally imported bobcat hides and provided false forms intended to show that the hides were legal;[15] agents were actively involved in killing wildlife.[16]

Washington courts have repeatedly rejected the outrageous conduct defense in cases in which police were engaged in illegal activities. Our courts have declined to find outrageous conduct where police informants engaged in acts of prostitution and attempted to recruit new prostitutes,[17] or engaged the services of a prostitute.[18] Our courts have also declined to find outrageous conduct where

[10]425 U.S. at 491, 495.

[11]Danny R. Veilleux, Annotation, *Actions by State Official Involving Defendant as Constituting "Outrageous" Conduct Violating Due Process Guaranties*, 18 A.L.R.5th 1, 25 (1994).

[12]*United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993).

[13]*State v. DeAngelo*, 830 P.2d 630, 632-33 (Or. Ct. App.), *review denied*, 840 P.2d 709 (1992).

[14]*Vaden v. Alaska*, 768 P.2d 1102, 1103, 1108 (Alaska), *cert. denied*, 490 U.S. 1109 (1989).

[15]*United States v. Ivey*, 949 F.2d 759, 762-63, 769 (5th Cir. 1991), *cert. denied*, 113 S. Ct. 64 (1992).

[16]*United States v. Stenberg*, 803 F.2d 422, 430-31 (9th Cir. 1986).

[17]*State v. Jessup*, 31 Wn. App. 304, 312-14, 641 P.2d 1185 (1982).

[18]*State v. Emerson*, 10 Wn. App. 235, 242, 517 P.2d 245 (1973).

the police themselves established an elaborate operation for the purchase and sale of stolen goods[19] or set up a phony job recruiting center and solicited the purchase of marijuana from a potential job applicant.[20]

We agree with Justice Horowitz, who, after discussing the outrageous conduct cases, analyzed the doctrine as a matter of competing public policies:

> Concepts of public policy and due process utilized by the proponents of each of the views described call for the balancing of the public policies involved and a choice of a public policy to be enforced. Public policy requires that crime be detected and its perpetrators punished. Public policy also requires that a defendant be fairly treated. Practical considerations require that, in the performance by police of crime detection duties, at least some deceitful practices and "a limited participation" in unlawful practices be tolerated and recognized as lawful. It is also part of public policy that competing public policies involved be reconciled to the end that these policies may be used without unnecessarily impairing the vigor of each. Such a reconciliation may be at least implicitly involved in arriving at due process principles.[21]

Public policy is generally a matter for the legislature.[22] The legislature has responded to concerns about improper police conduct by codifying the entrapment doctrine.[23]

Our inquiry under the outrageous conduct doctrine must focus on the issue of the defendant's rights, not on our evaluation of police conduct. As Justice Rehnquist observed in *Russell*:

> The execution of the federal laws under our Constitution is

---

[19]*State v. Brooks*, 30 Wn. App. 280, 281-82, 286-87, 633 P.2d 1345, *review denied*, 96 Wn.2d 1021 (1981).

[20]*Pleasant*, 38 Wn. App. at 79-80, 83.

[21]*Emerson*, 10 Wn. App. at 240-41.

[22]*See State v. Anderson*, 72 Wn. App. 253, 258, 863 P.2d 1370 (1993), *review denied*, 124 Wn.2d 1010 (1994); *State v. Pomeroy*, 68 Wash. 389, 391, 123 P. 514 (1912).

[23]RCW 9A.16.070.

confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations.[24]

Governmental misconduct must somehow impact the defendant's own rights before it rises to the level of outrageousness that will justify dismissing a prosecution. Our supreme court has repeatedly held that the court should not dismiss a criminal prosecution unless the governmental misconduct prejudices the defendant and materially affects the right to a fair trial.[25] Absent some violation of the defendant's own rights, the legislative and executive branches, not the judicial branch, should establish the parameters of acceptable police investigation and the extent to which the police may themselves violate the law in order to detect and prevent crime.

Assuming without deciding that the due process clause incorporates some doctrine of outrageous conduct by governmental agents separate and apart from the entrapment defense, we hold that the doctrine must be sparingly applied and used only in the most egregious situations. Or as this court has observed previously, "this defense is a rarely used judicial weapon reserved only for the most unusual circumstances."[26] This is not such a case. State and federal agents had reason to believe that there existed a substantial trade in illegally caught fish, which was sapping an already depleted natural resource important to our state and to the Indian tribes that have depended on this resource for centuries. Agent Hebner did not catch fish illegally. He simply acted as a conduit for the sale of fish already illegally caught. Defendant Rundquist has available to him the defense of entrapment, and he should

---

[24]*Russell*, 411 U.S. at 435.

[25]*Blackwell*, 120 Wn.2d at 830; *City of Spokane v. Kruger*, 116 Wn.2d 135, 144, 803 P.2d 305 (1991); *City of Seattle v. Orwick*, 113 Wn.2d 823, 830, 784 P.2d 161 (1989).

[26]*Pleasant*, 38 Wn. App. at 83.

have an opportunity to present that defense to the jury. The trial court abused its discretion in dismissing the charges on the ground of outrageous conduct.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SEINFELD, C.J., and FLEISHER, J. concur.

Review denied at 129 Wn.2d 1003 (1996).