# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53247-6-II |
| Respondent, | |
| v. | |
| HEATH LANDON MCMILLIAN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Heath Landon McMillian pled guilty to two counts of third degree rape of a child. He appeals the sentencing court's denial of his request for a special sex offender sentencing alternative (SSOSA) sentence, several community custody conditions, and the imposition of a community custody supervision fee. He argues that the sentencing court abused its discretion by not giving great weight to the minor victim TTC's opinion about the SSOSA request as required under RCW 9.94A.670(4). He further argues that two community custody conditions are not crime related, that one condition is vague, and that because he is indigent the sentencing court erred when it required him to pay community custody supervision fees. In addition, McMillian raises several claims in his statement of additional grounds for appeal (SAG).

We (1) hold that the sentencing court gave great weight to both the minor victim's and the victim's mother's opinions, (2) accept the State's concessions that the curfew and hitchhiking conditions were not crime related and that the requirement that McMillian report "any romantic

relationships" was impermissibly vague, (3) hold that the community supervision fee was properly imposed, and (4) reject McMillian's SAG claims because they either lack merit or cannot be considered on this record. Accordingly, we affirm the convictions and the trial court's denial of McMillian's SSOSA request, but we remand for the sentencing court to strike the curfew and hitchhiking community custody conditions and to revise the romantic relationship reporting requirement.

FACTS

I. GUILTY PLEAS

The State originally charged McMillian with four counts of third degree rape of a child involving the same victim, his step-daughter TTC. McMillian pleaded guilty to the amended charges of two counts of third degree rape of a child.

McMillian's plea statement advised him that he was giving up any "speedy" trial rights and that his right to appeal his guilty plea was "limited." Clerk's Papers (CP) at 7-8. The plea statement further provided that the State would recommend a SSOSA sentence, but it also cautioned McMillian that the trial court did not have to follow the sentencing recommendation.

McMillian also initialed the following special provision in the plea statement that related to the SSOSA:

> In addition to other eligibility requirements under RCW 9.94A.670, to be eligible for the special sex offender sentencing alternative, I understand that I must voluntarily and affirmatively admit that I committed all of the elements of the crime(s) to which I am pleading guilty. I make my voluntary and affirmative admission in my statement in paragraph 11 [of the plea statement].

*Id.* at 13.

McMillian provided the following statement:

> The judge has asked me to state what I did in my own words that makes me guilty of this crime, including enhancements and domestic violence relationships if they apply. This is my statement: On or between February 1, 2017, and December 31, 2017, on two separate and distinct occasions, I did engage in sexual intercourse (digital penetration of her vagina) with T.T.C., who did not consent to such sexual intercourse because there were no actual words or conduct indicating freely given agreement to have sexual intercourse, and such lack of consent was clearly expressed by T.T.C.'s conduct. This plea is also being made pursuant to *In re Barr*,[1] as the specific acts that occurred may not directly implicate the elements of the crime, but I wish to take advantage of the State's offer

*Id.* at 16. McMillian signed the plea agreement, acknowledging that he had read the entire agreement and understood it in full.

At the change of plea hearing, the superior court acknowledged that the State was recommending a SSOSA sentence. The court also asked McMillian if he understood that the court "doesn't need to follow any recommendation but can impose any sentence allowed under the law." Report of Proceedings (RP) (Jan. 7, 2019) at 7. McMillian confirmed that he understood. After finding a factual basis for the pleas, the court accepted the guilty pleas and ordered the Department of Corrections (DOC) to conduct a presentence investigation (PSI).

II. SENTENCING

A. PRESENTENCE INVESTIGATION AND PSYCHOSEXUAL EVALUATION

Before the sentencing hearing, the DOC submitted the PSI report. As part of the PSI, the investigator asked TTC's mother what type of sentence McMillian should receive. The PSI investigator described this conversation as follows:

> In closing, I asked [TTC's mother] what type of sentencing [McMillian] should receive. I explained to her the difference between receiving a SSOSA and being sentenced to prison. She feels that he should pay for what he has done. She believes

---

[1] *In re Pers. Restraint of Barr*, 102 Wn.2d 265, 267, 684 P.2d 712 (1984).

he has inflicted a lot of emotional pain on T.T.C and the family. She feels deceived and manipulated by [McMillian]. On the other hand, she said her and [McMillian] have a daughter in common. She wants the daughter to have contact with her father. She said that [McMillian] has contributed financially to her and the children and she would lose that income.

CP at 24.

The PSI investigator expressed concern about whether McMillian was admitting to or taking responsibility for his actions, noting that his admission merely mirrored his plea statement and that McMillian was still asserting that any sexual contact was accidental, that TTC had initiated the massages that had led to the sexual contact, and the he was merely pleading guilty so TTC would not have to testify. The investigator further noted that TTC's mother characterized McMillian's behavior as "grooming" and had stated that McMillian was "deceptive" and "manipulative." *Id.* at 28. The investigator recommended that the sentencing court deny the SSOSA request under these circumstances.

McMillian also underwent a psychosexual evaluation (PSE). In the PSE report, the evaluator also noted that McMillian had denied engaging in any sexual activity with TTC and that he asserted that the touching that had occurred was at TTC's request. The evaluator concluded, however, that "[d]enial is not necessarily a preclusion to successful treatment" and that "[t]here is nothing other than this to indicate [McMillian] is not an acceptable candidate for the [SSOSA] program." *Id.* at 39.

B. SENTENCING HEARING

At sentencing, the sentencing court[2] reviewed the PSI and the PSE. The State advised the sentencing court that the parties had agreed to recommend a SSOSA sentence.

___

[2] The sentencing took place before a different judge than the one who entered the guilty plea.

The sentencing court then invited TTC's mother to speak. TTC's mother characterized McMillian as manipulative, commented on his abuse of trust, and described the significant negative impact his actions had on TTC and TTC's half-sister.

TTC's mother also commented about McMillian's sentence:

> [*TTC] doesn't want him to go to prison because she loves him and because she still feels like it's her fault that he did this to her*. And I feel so many emotions about that alone that I don't know how to breathe sometimes. And it was my responsibility to protect her, and I have -- I feel like I have a pretty good BS meter, and there were a lot of times in our marriage and even after we separated where I would call Mr. McMillian on things, and it just didn't feel right. And -- and I always just let it -- let it be a benefit of the doubt, oh, he's just a kind of awkward but nice guy. He would never hurt us.
>
> I was really wrong. And I just want to make sure that no one else -- like I don't -- my daughter is really strong, and she's resilient, and hopefully she is going to see past this, and she's going to regain her strength in all of that, both of them, and know that they are ever more than this experience, and also I want to ensure that he really can accept accountability for what he's done, accept that there are lines, and that even if you feel a certain way because media is confusing or, you know, whatever, age is nothing but a number that you just don't cross those boundaries in real life.
>
> And as far as being allowed to see minors at his job,[3] um, a friend recently -- just recently had asked me if -- if anything was going to happen in regards to his work schedule, because they no longer go to shop at [where McMillian worked] because they are afraid to see him or for him to see their daughter, because he has previously commented on how pretty she is. She's eight.
>
> So I just ask that you please just put your BS meter up, and I'm hoping that I -- everybody knows what they're doing. And I'm sorry I'm just not -- I'm not as composed as I'd like to be, but thanks for seeing this case and for weighing it with the severity that it deserves.

RP (Feb. 25, 2019) at 7-9 (emphasis added).

---

[3] As part of the plea agreement, the State agreed to request accommodations that would allow McMillian to be around children in the context of his job at a grocery store.

TTC, who was 16 at the time of the sentencing hearing, did not address the sentencing court. But the State commented that it had spoken to TTC when the parties were working on the plea agreement and that it had based its recommendation on her expressed preferences.

Defense counsel responded that this was an agreed recommendation and discussed the PSI. Defense counsel admitted that McMillian had initially denied the allegations and was "still in denial . . . and wasn't accepting full responsibility" at the time of the PSI. *Id.* at 10. But counsel asserted that McMillian was now acknowledging what he had done and was accepting responsibility for his actions. Counsel also asserted that McMillian had admitted his actions during the PSI interview, but that McMillian had possibly not understand how to fill out the PSI questionnaires and had merely copied what was in the plea statement, making it appear that he was not taking responsibility.

When McMillian addressed the sentencing court, he admitted that he had "manipulated situations" to allow him to "rape" TTC, acknowledged that this "behavior was utterly wrong," and recognized that this was an abuse of trust that had damaged TTC and the rest of his family. *Id.* at 16. He then asked the court "for mercy" and requested a SSOSA sentence. *Id.*

After hearing from McMillian, the sentencing court gave the following oral ruling:

> So this is a difficult case, and not all agreed recommendations are difficult. Most are not. But this is a request for a SSOSA resolution of a horrific crime. The SSOSA law, which is found at RCW 9.94A.670, requires this court to make an independent decision, regardless of what is recommended to the court.
>
> There are a number of factors that the court has to consider, including whether the alternative is too lenient in light of the extent and circumstances of the offense. And also, unlike any other statute I know about, *it requires the court to give — and this is right from the statute — "great weight" to the victim's opinion* of whether the offender should receive a treatment disposition under the SSOSA statute.

*It sounds like there may be an opinion from the victim, the young victim in this case, that this is what she wants to have happen*. I'm not necessarily hearing that from the mother of the victim here, and that is the voice that this court must give great weight to.

Mr. McMillian, you talk about, you know, being a bad dad and you wish -- you want to have the opportunity to prove that you could be a person who would not be a bad dad. One of the most horrific things about these types of crimes caused by a dad, whether an actual blood dad or a step dad, is the violation of the trust and affection of a child, the abuse of that trust and affection that comes organically from a child to a parent.

I can't tell you how many times in this courtroom I hear victims of these types of crimes from horrific parenting, and yet they still love their parent. It is society's obligation to protect our children. It should never have to be society's obligation to protect that child from a parent. But the reality is, it's all too common, for that abuse of that trust and that that love that that child just gives to a parent for the simple reason of that adult being in the same house and raising a child.

That is an amazing amount of power that adults have over their children, an amazing amount of just power that's given to a parent, not because they passed a test, not because they have proven themselves to be a good human being, but simply because they're a parent. And that allows someone like you to do this to her. And that allows, after you do this horrific thing to her, for her to say to the State, I want this. I want leniency for him.

[Defense counsel], who not once but twice today has done a very admirable job in attempting to characterize his clients' positions. And he has done that for you, as well, no question. He has defined what you have -- your evolution of your recognition of what you've done.

You stand here today saying you know you did wrong. You know. You fully commit to the fact that you know that you did these horrible things, and there's no excuse for it. But that's not where you were when this started, and that's where you were on September 29,[4] and it's certainly not where you were on January 30,[5] despite the fact that [defense counsel] says he doesn't know how he got to that opinion. But the [PSI] is ambiguous with respect to your embracing what you did was wrong. Massaging the chest muscles of a girl is the way you described it.

---

[4] The PSE report was dated September 29, 2018.

[5] The PSI report was dated January 30, 2019.

> I have departed from joint recommendations in so few instances, even in SSOSAs when they are contested by the victims. But I can't in good conscience give great weight to the opinion of the mother and provide the leniency that a SSOSA would give you. I can't do it, not with the horrific abuse of this love and affection that this little girl gave to you and your abuse of that.

*Id.* at 17-20 (emphasis added).

The sentencing court sentenced McMillian to 17 months on each count and ran the sentences concurrently. The court also imposed 36 months of community custody.

The sentencing court also imposed several community custody conditions including, (1) a requirement that McMillian "[a]bide by the curfew set by the community corrections officer," (2) a prohibition against hitchhiking or picking up hitchhikers, and (3) a requirement that McMillian "[i]nform the Community Corrections Officer of any romantic relationships." CP at 52. Although the sentencing court did not discuss legal financial obligations (LFOs) or McMillian's indigency status during the sentencing hearing, the judgment and sentence ordered McMillian to pay community custody supervision fees as determined by the DOC.

McMillian appeals.

## ANALYSIS

McMillian argues that (1) the sentencing court abused its discretion by giving great weight to TTC's mother's opinion and not giving sufficient weight to TTC's opinion as required under RCW 9.94A.670(4), (2) the community custody conditions related to curfew and hitchhiking are not crime related and the community custody condition requiring him to report "any romantic relationships" is impermissibly vague, Br. of Appellant at 15; and (3) the trial court erred when it imposed the community supervision fee because he is indigent. McMillian also raises several issues in his SAG.

I. DENIAL OF SSOSA

McMillian first argues that the sentencing court misapplied the law and abused its discretion when it denied the SSOSA request without giving TTC's opinion "great weight" as required under RCW 9.94A.670(4). We disagree.

A. LEGAL PRINCIPLES

We review a sentencing court's denial of a request for a SSOSA sentence for an abuse of discretion. *State v. Osman*, 157 Wn.2d 474, 482, 139 P.3d 334 (2006). A sentencing court abuses its discretion if its "'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)). "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *Id.* (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

Sentencing courts must generally impose sentences within the standard range. *Osman*, 157 Wn.2d at 480. But if an offender is eligible for and requests a SSOSA sentence, the court must decide whether that alternative is appropriate. *Id.* In determining whether the SSOSA is appropriate, the sentencing court must consider several factors, including, but not limited to "whether the offender and the community will benefit from use of this alternative, . . . whether the alternative is too lenient in light of the extent and circumstances of the offense, . . . whether the offender has victims in addition to the victim of the offense, . . . whether the offender is amenable to treatment, . . . the risk the offender would present to the community, to the victim, or to persons

of similar age and circumstances as the victim, and . . . the victim's opinion whether the offender should receive a treatment disposition under this section. RCW 9.94A.670(4).

The sentencing court is required to "give great weight to the victim's opinion whether the offender should receive" a SSOSA sentence. RCW 9.94A.670(4). In this context,

> "[v]ictim" means any person who has sustained emotional, psychological, physical, or financial injury to person or property as a result of the crime charged. "Victim" also means a parent or guardian of a victim who is a minor child unless the parent or guardian is the perpetrator of the offense.

RCW 9.94A.670(1)(c).

B. GREAT WEIGHT REQUIREMENT

McMillian contends that the sentencing court failed to follow RCW 9.94A.670(4)'s "great weight" requirement because the court gave great weight only to TTC's mother's opinion and ignored TTC's opinion entirely. We disagree.

In its oral ruling, the sentencing court acknowledged TTC's opinion about McMillian's sentencing, noting that she had requested the SSOSA sentence. The sentencing court discussed and considered TTC's opinion at length. The court then weighed TTC's opinion against her mother's opinion, to which the court was also required to accord great weight. Notably, TTC's mother had commented that TTC loved McMillian and that she still felt that she was responsible for the incidents. In light of the potential undue influence a parent/child relationship can assert on a child victim, the sentencing court ultimately found TTC's mother's opinion more persuasive. Although the sentencing court found TTC's mother's opinion more persuasive, the court's extensive discussion of TTC's competing opinion demonstrates that the trial court gave great weight to both opinions.

Because the sentencing court gave great weight to both TTC's and her mother's opinions, the sentencing court did not abuse its discretion. Accordingly, this argument fails.

## II. COMMUNITY CUSTODY CONDITIONS

### A. CURFEW AND HITCHHIKING CONDITIONS

McMillian next argues that we should strike the curfew and hitchhiking community custody conditions because they are not crime related. The State concedes that these conditions are not crime related.

Community custody conditions must relate to the circumstances of the crime. *State v. Nguyen*, 191 Wn.2d 671, 683, 425 P.3d 847 (2018). Because nothing in the record shows that the crimes were related to the time of day or any hitchhiking-related activity, these conditions are not crime related. Accordingly, we accept the State's concession and remand to strike these community custody conditions is required.

### B. ROMANTIC RELATIONSHIP CONDITION

McMillian further argues that we should strike the community custody condition requiring him to report "any romantic relationships" because this condition is unconstitutionally vague. Br. of Appellant at 15. The State concedes that the term romantic relationship is vague. We accept the State's concession.

"We review community custody conditions for an abuse of discretion and will reverse them if they are manifestly unreasonable." *Nguyen*, 191 Wn.2d at 678. "A trial court's imposition of an unconstitutional condition is manifestly unreasonable." *Id.*

"The Fourteenth Amendment to the United States Constitution along with article I, section 3 of the Washington State Constitution require that citizens be afforded fair warning of proscribed

conduct." *Id.* "[A] community custody condition is unconstitutionally vague if it '(1) . . . does not define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is proscribed, or (2) . . . does not provide ascertainable standards of guilt to protect against arbitrary enforcement.'" *Id.* at 678-79 (alterations in original) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990).

In *Nguyen*, our Supreme Court examined a community custody condition requiring the appellant to disclose any "dating relationship." 191 Wn.2d at 681. In its analysis, the court discussed a federal decision, *United States v. Reeves*, 591 F.3d 77 (2d Cir. 2010), which "held that the term 'significant romantic relationship' was unconstitutionally vague." *Nguyen*, 191 Wn.2d at 682 (quoting *Reeves*, 591 F.3d at 79). Our Supreme Court recognized that in *Reeves* the court distinguished requirements regarding the reporting of a "'dating relationship'" from those requiring the reporting of a "'significant romantic relationship,'" based on the "'highly subjective'" nature of the terms "'significant'" and "'romantic.'" *Id.* at 682-83.

Subsequently, in *State v. Peters*, 10 Wn. App. 2d 574, 590-91, 455 P.3d 141 (2019), Division Three of this court relied on *Nguyen* to hold that a condition requiring reporting of "'romantic relationships'" was vague. Division Three also held that the proper remedy was to remand the community custody condition for the term "romantic relationship" to be replaced with "dating relationship." *Id.*

We agree with *Peters*. Accordingly, we accept the State's concession that the requirement that McMillian report any romantic relationship is vague, and remand to the sentencing court for the term "romantic relationship" to be replaced with "dating relationship."

III. COMMUNITY CUSTODY SUPERVISION FEE

Relying on RCW 9.94A.760(1) and RCW 10.01.160(3), McMillian next argues that because he is indigent the trial court erred by imposing community custody supervision fees, which he characterizes as discretionary "costs." Br. of Appellant at 20. Because community custody supervision fees are not costs, we disagree.

RCW 9.94A.760(1) states, in part,

> Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation as part of the sentence. The court may not order an offender to pay *costs as described in RCW 10.01.160* if the court finds that the offender at the time of sentencing is indigent as defined in RCW 10.101.010(3) (a) through (c).

(Emphasis added.) Similarly, RCW 10.01.160(3)[6] provides, "The court shall not order a defendant to pay *costs* if the defendant at the time of sentencing is indigent as defined in RCW 10.101.010(3) (a) through (c)." (Emphasis added.) Under RCW 10.01.160(2), "[c]osts shall be limited to expenses specially incurred by the state in prosecuting the defendant or in administering the deferred prosecution program under chapter 10.05 RCW or pretrial supervision."

RCW 9.94A.703(2)(d)[7] governs supervision fees and states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [Department of Corrections]." Supervision fees are discretionary LFOs. *State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 25 (2020); *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018), *review denied*, 193 Wn.2d 1007 (2019). But supervision

---

[6] Because this case is not yet final, the current version of RCW 10.01.160(3) applies. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

[7] The legislature amended RCW 9.94A.703 in 2018. LAWS OF 2018, ch. 201 § 9004. Because the amendment did not change subsection (2), we cite to the current version of the statute.

fees are not discretionary "costs" merely because they are discretionary LFOs—they must meet the definition of a "cost" contained in RCW 10.01.160(2). Supervision fees fail to meet RCW 10.01.160(2)'s definition of a "cost" because they are not expenses specially incurred by the State "to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision." *Spaulding*, 15 Wn. App. 2d at 536-37.

Because supervision fees are not "costs" as defined under RCW 10.01.160(2), neither RCW 9.94A.760(1) nor RCW 10.01.160(3) prohibit the trial court from imposing the fees based on a defendant's indigency. Accordingly, this argument fails.

McMillian's argument that the conclusion that community custody supervision fees are not costs is incorrect because DNA testing fees are waived if the fees have previously been paid even though DNA testing fees are not costs incurred during the prosecution of the charge or a cost of pretrial supervision. But, unlike supervision fees, duplicate DNA fees are expressly precluded under a different statute, RCW 43.43.7541. Accordingly, this argument is not persuasive.

Relying on *State v. Leonard*, 184 Wn.2d 505, 507-08, 358 P.3d 1167 (2015), McMillian also asserts that because community custody supervision fees are discretionary, the court must examine his ability to pay. But in *Leonard*, unlike here, the costs at issue were medical costs under RCW 70.48.130, and RCW 70.48.130(6) contains an express provision that requires the court to address a prisoner's ability to pay.

We note, however, that "[t]he barriers that LFOs impose on an offender's reintegration to society are well documented . . . and should not be imposed lightly merely because the legislature has not dictated that judges conduct the same inquiry required for discretionary costs." *State v. Clark*, 191 Wn. App. 369, 376, 362 P.3d 309 (2015). We agree that this important policy should

be broadly supported. Therefore, we encourage the trial court on remand to reexamine the imposition of the supervision fees.

## IV. SAG

McMillian raises several additional claims in his SAG. These claims either fail or we cannot address them because they relate to matters outside the record.

First, McMillian contends that he should have been allowed to move to withdraw his guilty plea when it became apparent that the sentencing court was not going to grant the SSOSA request. Before sentencing, McMillian could have moved under CrR 4.2(f) to withdraw his guilty pleas. Under CrR 4.2(f), he would have had to show that the withdrawal of the pleas was necessary to correct a manifest injustice. After sentencing, McMillian could have moved to withdraw the pleas under CrR 7.8. CrR 4.2(f). Under CrR 7.8, McMillian would have had to show (1) "[m]istakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order," (2) withdrawal of the plea was necessary due to newly discovered evidence, (3) "[f]raud . . . , misrepresentation, or other misconduct" by the State, (4) the judgment was void, or (5) "[a]ny other reason justifying relief from the operation of the judgment." The fact the sentencing court declined to grant the SSOSA request does not qualify under either CrR 4.2(f) or CrR 7.8 because McMillian was advised before entering his pleas that the sentencing court was not required to follow the joint recommendation. Accordingly, McMillian does not show that he is entitled to relief on this ground.

Second, McMillian contends that his guilty pleas were invalid because defense counsel and the prosecutor misadvised him about the likelihood the trial court would grant the SSOSA request, did not fully investigate the chances that the court would grant the SSOSA, or failed to properly

advise him about what to say during the PSI process. The record does not contain any information regarding what defense counsel or the prosecutor told McMillian regarding any of these matters. Because the information necessary to address this claim is outside the record, we cannot address this claim. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Third, McMillian asserts that defense counsel provided ineffective assistance of counsel by failing to move to withdraw the pleas or by misadvising McMillian about the likelihood the sentencing court would follow the sentencing recommendation and grant the SSOSA request. To establish ineffective assistance of counsel, McMillian must establish both deficient performance and resulting prejudice. *McFarland*, 127 Wn.2d at 336-37; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As discussed above, the fact the sentencing court declined to deny the SSOSA request does not establish grounds to withdraw a guilty plea under either CrR 4.2(f) or CrR 7.8. Thus, McMillian cannot establish that a failure to make such motions was deficient performance. Accordingly, McMillian fails to establish ineffective assistance of counsel based on defense counsel's failure to move to withdraw the guilty pleas. Furthermore, also as discussed above, the record does not contain any information regarding defense counsel's advice to McMillian about the likelihood the sentencing court would grant the SSOSA request, so, to the extent this argument is based on defense counsel's failure to properly advise McMillian, we cannot address this claim. *McFarland*, 127 Wn.2d at 335.

Fourth, McMillian contends that the sentencing court failed to give adequate weight to TTC's opinion of whether a SSOSA was appropriate. This claim duplicates appellate counsel's claim addressed above. Accordingly, we do not address it separately.

Fifth, McMillian contends that the sentencing court failed to warn him of his rights as required under CrR 7.2(b), thereby denying him of his right to withdraw his guilty pleas. CrR 7.2(b) requires the sentencing court to advise the defendant of various rights immediately after imposing the sentence, but none of those rights include the right to move to withdraw a guilty plea. Accordingly, this claim fails.

Sixth, McMillian contends that his request for counsel to be present during the PSI process was denied and that counsel's absence resulted in the PSI report not recommending a SSOSA. We cannot address this issue because it relates to matters outside the record. *McFarland*, 127 Wn.2d at 335.

Seventh, McMillian contends that defense counsel provided ineffective assistance of counsel related to the first trial continuance and or time for trial waiver. But McMillian waived any time for trial objections when he entered into the plea agreement, so he cannot now raise this claim.

Finally, McMillian asks us to waive appellate costs and fees due to his indigence. We defer this decision to the commissioners should the State seek costs under RAP 14.1(f). *See* RAP 14.2.

CONCLUSION

We (1) hold that the sentencing court gave great weight to both the minor victim's and the victim's mother's opinions (2) accept the State's concessions that the curfew and hitchhiking conditions were not crime related and that the requirement that McMillian report any "romantic relationships" was impermissibly vague, (3) hold that the community supervision fee was properly imposed, and (4) reject McMillian's SAG issues because they either lack merit or cannot be considered on this record. Accordingly, we affirm the conviction and denial of McMillian's

No. 53247-6-II

SSOSA request, but we remand for the sentencing court to strike the curfew and hitchhiking community custody conditions and to revise the romantic relationship reporting requirement.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

MELNICK, J.P.T.