IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40059-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL ORREN GORSKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Michael Gorski was convicted in 2013 of second degree murder for the 1997 killing of Carolyn Clift. In 2023, Mr. Gorski filed a motion for postconviction DNA testing of some of the items collected from the crime scene and Ms. Clift's body. The superior court denied his motion after a hearing.

Mr. Gorski appeals, arguing the court (1) relied on facts unsupported by the trial record, (2) misapplied the favorable presumption of exculpatory DNA results, and (3) incorrectly denied his motion. Because Mr. Gorski failed to demonstrate that, considering all the evidence from trial and assuming an exculpatory DNA test result, it is

likely that he is innocent on a more probable than not basis, we affirm the trial court and

decline review of his remaining claimed errors.

## BACKGROUND

Ms. Clift was stabbed to death in her Selah, Washington apartment in August

1997. Ms. Clift suffered four stab wounds: one in the abdomen, one in the chest, and one

between her shoulder blades that had two wound paths. The stab wound between Ms.

Clift's shoulder blades required an unusual amount of force as it cut through her

vertebrae. Daniel Selove, MD, who performed the autopsy of Ms. Clift's body, opined

that an object may have been used "to pound the knife to force it through bone." Rep. of

Proc. (RP)[1] at 661.

Ms. Clift was given a ride home from a nearby liquor store by Mr. Gorski on the

afternoon of her murder. Ms. Clift was seen later the same evening at a video store and a

nearby bar she frequented called the Wagon Wheel. Ms. Clift's neighbors heard

screaming coming from her apartment at 11:19 p.m. that night. A neighbor hollered to

Ms. Clift through her screen door but received no response. Another neighbor, Virginia

Jones, saw a man run into Ms. Clift's apartment and back out while another neighbor,

Lila Powell, called 911. Law enforcement officers arrived within minutes to find Ms.

Clift deceased.

---

[1] Unless otherwise specified, "RP" refers to the report of proceedings related to Mr. Gorski's trial beginning on January 22, 2013.

Ms. Clift's body was discovered naked and face down on the living room floor of her apartment. A tipped over wooden rocking chair and a bathrobe were found near the center of the living room. Blood spatter evidence and lack of a blood trail indicated Ms. Clift was killed where her body was found. Investigators seized the bathrobe, a section of carpet, a pillow from the rocking chair, a semen-stained blanket from the couch, and a semen-stained tube top from the bathroom, among other items. Officers also collected a pack of cigarettes, a pair of glasses found on the table next to the couch, and cigarette butts located near the front door of the apartment. DNA from Mr. Gorski and Ms. Clift was later recovered on the discarded cigarette butts. Dr. Selove collected fingernail clippings and vaginal, oral, and anal swabs from Ms. Clift's body during the autopsy. Several hairs or fibers were also recovered from Ms. Clift's body, including one found inside her abdominal stab wound.

Mr. Gorski was an early suspect in Ms. Clift's murder as he had been seen with her on the day of her death. Mr. Gorski admitted during an interview with law enforcement that he gave Ms. Clift a ride home from the liquor store on the day of her murder but denied going into her apartment. Mr. Gorski also claimed he had never met Ms. Clift prior to giving her a ride home. Mr. Gorski was living with Frank Brugnone at the time of Ms. Clift's murder. Despite efforts to identify Ms. Clift's killer, the case went cold.

The Yakima Herald Republic published a story about Ms. Clift's death in 2007. After reading the article, Cecil Toney reported to law enforcement that he had seen Mr. Gorski and Mr. Brugnone in the parking lot of Ms. Clift's apartment complex between 11:00 p.m. and 12:00 a.m. on the night she was murdered. In 2011, new DNA technology was used to test the fingernail clippings taken from Ms. Clift. Mr. Gorski's DNA was found under the fingernail clippings collected from both of Ms. Clift's hands. An unidentified male's DNA profile was also found on the fingernail clippings from Ms. Clift's right hand.

In July 2011, Mr. Gorski and Mr. Brugnone were charged with second degree murder for the killing of Ms. Clift, and their cases were joined for trial. Mr. Gorski's case was tried to a jury while Mr. Brugnone's case was simultaneously tried to the bench.

The State presented the testimony of many witnesses at trial. Dr. Selove testified regarding Ms. Clift's autopsy findings. He also testified that there was no evidence of trauma that would indicate that Ms. Clift had been sexually assaulted.

Ms. Jones testified that Ms. Powell[2] heard screams coming from Ms. Clift's apartment on the night of the murder. After Ms. Jones and Ms. Powell conferred, Ms. Jones went to Ms. Clift's "door and hollered at her," but "she didn't answer." RP at 858. Ms. Powell then called law enforcement. While Ms. Powell was calling the police, Ms.

---

[2] Ms. Powell passed away before Mr. Gorski's trial. Details about Ms. Powell's observations were admitted through Ms. Jones.

Jones saw a man run inside Ms. Clift's apartment and run back out. Ms. Jones stated she had concerns about Ms. Clift's "habits" and about "how many men were coming" to her apartment. RP at 858-59.

Carolee Appleton, another of Ms. Clift's neighbors, testified that in the weeks leading up to Ms. Clift's murder, she had twice witnessed two men arrive in a blue pickup truck, with only the passenger getting out and entering Ms. Clift's apartment. Ms. Appleton saw the same blue truck and the same two men on the night of Ms. Clift's murder. Ms. Appleton testified that on the night of the murder, she saw the "own[er]" of the truck "running" to his truck from the area of Ms. Clift's apartment building but that he ran back to Ms. Clift's apartment, "banged" on the door, "and said to the buddy inside, it's taking too long. Come on. Hurry." RP at 961-62. Ms. Appleton then saw another man "running" out of Ms. Clift's apartment with "a towel held up" covering his head. RP at 964. Ms. Appleton also saw Ms. Powell knock on Ms. Clift's door and call to Ms. Clift. She testified that the man shielding his head with the towel ran to the truck while yelling, "[G]et it started. Get it started. We got to get going." RP at 965. Ms. Appleton claimed the driver of the truck responded by asking, "Did you do it?" or "[W]hat did you do?" RP at 1011, 1013. Ms. Appleton then witnessed the man with the towel get into the passenger side of the truck, and the two quickly left the area. It was later discovered Mr. Brugnone owned a blue Ford pickup truck.

Meghan Nunley, who was Mr. Gorski's former girlfriend and the ex-wife of Mr. Toney, testified that Ms. Clift, Mr. Brugnone, and Mr. Gorski frequented the Wagon Wheel. Mr. Brugnone and Mr. Gorski were sometimes at the Wagon Wheel at the same time as Ms. Clift, and the two referred to Ms. Clift as "the crazy lady." RP at 925. Ms. Nunley testified that Mr. Gorski had come to her house on the night of Ms. Clift's death, stayed for 30 to 40 minutes, and left around 10:00 p.m. Ms. Nunley stated that Mr. Brugnone and Mr. Gorski lived together at the time of Ms. Clift's murder. Ms. Nunley "vaguely remember[ed Mr. Brugnone] asking [her] for an alibi" for the night of Ms. Clift's murder. RP at 926.

Mr. Toney testified he saw Mr. Gorski and Mr. Brugnone, whom he was acquainted with, in the parking lot outside of Ms. Clift's apartment complex on the night of her murder. He testified that his headlights illuminated Mr. Gorski and Mr. Brugnone as he turned his vehicle around. They were "[s]tanding in the parking lot [of Ms. Clift's apartment complex] between two cars." RP at 782. Mr. Gorski and Mr. Brugnone "duck[ed] down" when Mr. Toney's "headlights hit" them. RP at 782.

Erica Graham, a supervising forensic scientist with the Washington State Patrol crime laboratory, testified that Mr. Gorski's DNA was found on two of the cigarette butts collected from the front door area of Ms. Clift's apartment. Mr. Gorski's DNA was also found on a pair of eyeglasses collected from Ms. Clift's living room. Finally, Ms. Graham confirmed Mr. Gorski's DNA was found under the fingernail clippings taken

from both of Ms. Clift's hands.  Ms. Graham testified another person's DNA was found under the fingernail clipping from Ms. Clift's left hand but she "unfortunately did not get a" DNA match because it was "just a trace result."  RP at 1201.  Another witness testified that the presence of DNA under someone's fingernails "indicates more than casual touching."  RP at 1338.

Ms. Graham stated that the swabs taken from Ms. Clift's mouth and anus indicated the likely presence of semen in those areas.  However, she was unable to determine who the DNA contributor was because "there was not enough DNA present in [the] sample[s] to be able to give enough information to make a reliable [DNA] comparison."  RP at 1208.  Other items collected from the crime scene were also tested for DNA, including a blanket found on Ms. Clift's couch, and a semen-stained tube top collected from Ms. Clift's bathroom.  The blanket yielded DNA from at least four men, none of whom were Mr. Gorski.  The tube top contained DNA from an unidentified man.

Mr. Gorski testified in his own defense.  Mr. Gorski admitted that he gave Ms. Clift a ride home from "the liquor store" on the day of her murder and maintained he had never met her before that day.  RP at 1591.  However, Mr. Gorski admitted he went into Ms. Clift's apartment, contrary to his earlier statements to law enforcement.  He described Ms. Clift's apartment as "extremely messy" and "a house of a hoarder."  RP at 1598.  Mr. Gorski testified he stayed in Ms. Clift's apartment for 15 to 20 minutes while the two drank together.  He testified Ms. Clift "started kissing [him]" while inside of her

apartment. RP at 1606. He said, "She's got her hands on me and holding me and touching me. I'm doing the same with her" but that he was not really "into it." RP at 1607. Mr. Gorski testified at that point, he was "looking for an exit," and he "just walked out." RP at 1608. Mr. Gorski testified that he went to Ms. Nunley's house after leaving Ms. Clift's apartment and stayed there from 8:00 p.m. until 10:00 or 10:30 p.m. He testified he then went to Mr. Brugnone's house, where he was living, talked with Mr. Brugnone and his wife, and then went to bed. Mr. Gorski denied having any sexual contact with Ms. Clift.

The jury found Mr. Gorski guilty of second degree murder. Mr. Gorski's conviction was later affirmed on direct appeal. *State v. Brugnone*, No. 31529-1-III consol. with *State v. Gorski*, No. 31563-1-III (Wash. Ct. App. Sept. 13, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/315291_unp.pdf.

In 2023, Mr. Gorski brought a "Motion for Post-Conviction DNA Testing Pursuant to RCW 10.73.170," seeking testing of a "carpet sample," a pillow found on "an overturned chair," a bathrobe, "four hairs found on or near" Ms. Clift's body, and "the remaining DNA extract from the tube top recovered" from Ms. Clift's bathroom. Clerk's Papers (CP) at 333-34. Mr. Gorski also sought retesting of the oral, anal, and vaginal swabs taken from Ms. Clift's body.

The court heard arguments on the motion and later issued a letter decision denying the motion. The trial court concluded, "A favorable DNA result would not demonstrate

the innocence of Mr. Gorski on a more probable than not basis." CP at 815. The court

incorporated its letter decision into an order denying the motion.

Mr. Gorski appeals the denial of his motion for postconviction DNA testing.

ANALYSIS

We review a trial court's decision on a motion for postconviction DNA testing for

abuse of discretion. *State v. Riofta*, 166 Wn.2d 358, 370, 209 P.3d 467 (2009). A court

abuses its discretion when its "order is manifestly unreasonable or based on untenable

grounds." *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). "A discretionary

decision 'is based on untenable grounds or made for untenable reasons if it rests on facts

unsupported in the record or was reached by applying the wrong legal

standard.'" *Id.* (internal quotation marks omitted) (quoting *State v. Rundquist*, 79 Wn.

App. 786, 793, 905 P.2d 922 (1995)).

There is no constitutional right to DNA testing. *Dist. Att'y's Office for Third Jud.

Dist. v. Osborne*, 557 U.S. 52, 73-74, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009).

However, Washington law provides a mechanism for persons convicted of a felony in

this state, who are currently serving a term of imprisonment, to seek DNA testing to

establish their innocence. RCW 10.73.170; *State v. Crumpton*, 181 Wn.2d 252, 258, 332

P.3d 448 (2014). RCW 10.73.170 contains both procedural and substantive components.

*Crumpton*, 181 Wn.2d at 258. The State concedes that Mr. Gorski has satisfied his

procedural burden.

9

At issue in this appeal is the substantive portion of the statute that requires the convicted individual show "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). "To determine the probability that a petitioner could demonstrate his innocence with the aid of favorable DNA test results, courts must consider the evidence produced at trial along with any newly discovered evidence and the impact that an exculpatory DNA test could have in light of this evidence." *Riofta*, 166 Wn.2d at 369. "It is only within the context of the other evidence that the court can determine whether DNA evidence might demonstrate innocence." *Crumpton*, 181 Wn.2d at 262.

Mr. Gorski contends the court abused its discretion in denying his motion because the presence of a DNA profile other than his own on several items of evidence gives rise to a strong inference that it is the DNA profile of Ms. Clift's true killer. In particular, Mr. Gorski seeks testing of: swabs taken from Ms. Clift's mouth, vagina, and anus; hairs found on her body; hairs or fibers found inside one of her stab wounds; a bathrobe; a pillow; a tube top; and a section of carpet stained with semen. He contends that unlike other evidence linking him to the crime, "all of these items are linked by strong circumstantial evidence to the [crime]." Appellant's Opening Br. at 63.

Postconviction DNA testing is not limited to single perpetrator crimes. Rather, the success of a motion for postconviction DNA testing is dependent on the evidence

10

admitted at trial. Here, unlike the facts in *State v. Crumpton*,[3] *State v. Gray*,[4] and *State v. Thompson*,[5] DNA testing that conclusively excludes Mr. Gorski as a contributor would not rule out his involvement in the crime in light of the other evidence. Alternatively stated, regardless of whether a single individual's DNA is identified on all the items Mr. Gorski now seeks DNA testing of, it would not rule out his involvement in light of the other evidence.

Here, DNA evidence played an ancillary role in Mr. Gorski's conviction. In the context of all the evidence, the DNA evidence was only important to establish Mr. Gorski, contrary to his prior statements to law enforcement, had been in Ms. Clift's apartment and that his DNA was found under her fingernail clippings, suggesting more than just casual contact between he and Ms. Clift. As detailed above, Mr. Gorski's conviction was largely secured due to strong circumstantial evidence and eyewitness testimony. Consequently, any favorable DNA testing results, regardless of the profile being redundant across the items tested or attributed to more than one individual, would not rule out Mr. Gorski's involvement. Rather, such results would simply point to another suspect, which does little to establish a likelihood that the DNA evidence would demonstrate his innocence on a more probable than not basis.

---

[3] 181 Wn.2d 252, 332 P.3d 448 (2014).

[4] 151 Wn. App. 762, 215 P.3d 961 (2009).

[5] 173 Wn.2d 865, 271 P.3d 204 (2012).

Turning to the items Mr. Gorski requests be tested, there was no evidence presented at trial that rape or sexual assault played a part in the murder. There was evidence, however, that Ms. Clift had many sexual partners. Thus, he would not be exonerated even if DNA testing of the swabs from Ms. Clift's body and DNA on the carpet identified one or more persons other than Mr. Gorski. Instead, those presumed favorable results would merely demonstrate that some other person was in Ms. Clift's apartment and had sex with her at some point prior to her death. Importantly, the jury was aware that DNA from multiple men, some unidentified, was found at the crime scene.

The hairs or fibers found on Ms. Clift's body and inside of her stab wound were of limited significance. Again, the jury was aware of the existence of this evidence and was presented with expert testimony as to its limited significance. In discussing the fibers or hairs found in and on Ms. Clift's body, Dr. Selove testified, "Cloth fibers may remain from the clothing or from the assailant's clothing or from the surfaces near the body in the room in which they are found or living." RP at 664. He further testified that the "fiber or hair" found in her stab wound could have been

> [t]ransferred from clothing or hair on [Ms. Clift] or the attacker, yes. When I say on [Ms. Clift], that includes both something she's wearing or fiber or hair that's in her—in this residence and was transferred into her wound on the knife or because it was on her skin at the time. Yes, from the attacker or from something that was over the area that was stabbed.

12

RP at 665. Thus, presuming an exculpatory result, in all likelihood, Mr. Gorski would still not be exonerated. It is just as likely that the hair or fiber came from her murderer as it is that it was transferred into her wound from the knife used to stab her, her skin, or from something in her residence. Indeed, the jury heard that Ms. Clift's apartment was rather unkempt, leaving open a distinct possibility that any hair or fiber found on or in her body was transferred there from her environment.

Finally, as to the bathrobe, tube top, and pillow, there was no indication that any of those items were directly involved in Ms. Clift's murder or that her murderer interacted with them. The bathrobe Mr. Gorski seeks testing of had no blood on it nor was it torn or otherwise damaged. The pillow was from the wooden rocking chair that was overturned, presumably during the struggle between Ms. Clift and her murderer. Though the chair was knocked over, there is no evidence that the pillow on it was handled by the assailant. Moreover, the tube top with semen stains on it was found in Ms. Clift's bathroom, not near her body or the scene of the murder. Again, importantly, the jury was aware that the semen stains on the tube top did not match Mr. Gorski's DNA.

The court did not abuse its discretion in denying Mr. Gorski's motion for postconviction DNA testing because Mr. Gorski failed to show a likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis. Because Mr.

No. 40059-0-III
*State v. Gorski*

Gorski is unable to meet his burden under RCW 10.73.170(3), we decline review of his remaining claimed errors.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Staab, A.C.J.

Murphy, J.

14